**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Samuel GEORGE, Defendant-Appellant.**

**No. 84–2468.**

United States Court of Appeals,
Tenth Circuit.

Nov. 29, 1985.

Reber Boult, Albuquerque, N.M., for defendant-appellant.

Jennifer A. Salisbury, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., Mark D. Jarmie, Asst. U.S. Atty., on brief) Albuquerque, N.M., for plaintiff-appellee.

Before BARRETT and MOORE, Circuit Judges, and BRETT,* District Judge.

BRETT, District Judge.

This is an appeal by Samuel George, age 22 years, from a conviction, following a jury verdict, for voluntary manslaughter on an Indian reservation in violation of 18 U.S.C. §§ 1153 and 1112. After a benefit

* The Honorable Thomas R. Brett, United States District Judge for the Northern District of Oklahoma, sitting by designation.

finding, the defendant-appellant was sentenced to confinement under the Youth Corrections Act. 18 U.S.C. §§ 4216 and 5010(b).

In brief, the defendant-appellant sets forth six assignments of error, one being in two subparts. As is reflected from the following analysis, the judgment and sentence of the trial court is hereby affirmed.

## STATEMENT OF FACTS

On the evening of May 19, 1984, Herman John Kellywood was outside his home near the small farming community of Hogback, near Shiprock, New Mexico, drinking alcoholic beverage with two friends, Darrel Yazzie and Patrick Harvey, a/k/a Bear Claw. Herman John Kellywood got quite inebriated, had trouble walking, and his friends advised him to go home. On his way home, Herman and his friends met brothers, Samuel and Kenneth George, who also appeared inebriated. Kenneth George, Kellywood and Yazzie decided to wait near Kellywood's home as Samuel George and Harvey drove to a local bar to get more beer. While waiting there, Kenneth George was being loud and was demonstrating the use of a set of "nunchaku" he had with him.[1] Kenneth George was not threatening Kellywood or Yazzie, nor did he attempt to hit either of them. After Samuel George and Harvey returned with more beer, Yazzie and Harvey left, leaving Kellywood in the company of Samuel and Kenneth George.

Sometime that evening Herman John Kellywood was beaten to death. He was struck at least ten times with a blunt object, resulting in fractures to his skull, causing death within minutes of the beating.

A rock which appeared to have blood stains on it was found near Herman John Kellywood's body and was received in evidence. A pathologist stated the rock could have been used as a weapon by the assailant and would be consistent with the wounds inflicted. There was no scientific evidence the substance on the rock was blood, because the sampled material was too small to test.

At 8:30 to 9:00 on the evening of Herman John Kellywood's death, Samuel and Kenneth George approached Derrick King, a young eighteen-year-old Indian man, who lived near the Kellywoods. Derrick King was busy irrigating the family farm when the George brothers approached him. King noticed that Samuel's shirt and jacket had blood on the front of them, but there was no sign that Kenneth George had been in a fight. King had previously known Kenneth George, in school, but had not seen Samuel George before.

King declined the George brothers' offer to go down to the river and "party" with them, because he wanted to complete his work and go home. Samuel George repeatedly asked King if King was going to tell on them. King observed that Samuel George was intoxicated, and at that time King did not know what he was talking about. Samuel George then started shouting, "When I get mad, I get real mad." Samuel George then asked King to give him the shovel King had in his hand, and King refused. Samuel George then picked up a rock and made a motion as though he were going to hit King with it. Samuel's brother, Kenneth, then appeared at a nearby fence and Samuel George said to him, "Shall we kill this guy, too?" King ran for home when the George brothers started throwing rocks at him. He and his mother then drove to a nearby telephone to call the police. By the time the police arrived, the George brothers had left.

Special Agent Richard Felter of the Federal Bureau of Investigation and Officer Daniel Lee of the Navajo Division of Public Safety interviewed Samuel George at his home approximately ten days after Herman John Kellywood's death. Samuel George at that time said he had no knowledge concerning the killing or death of

---

1. A "nunchaku", also known as "nunchucks", is an Oriental martial arts weapon comprised of two pieces of wood or steel connected by a cord or chain and which can be held in the hands. It had its origin as a farm implement in Okinawa.

Herman John Kellywood. Samuel George admitted drinking with his brother, Patrick "Bear Claw" Harvey, and another unknown individual on the night of Kellywood's death. He then stated he and his brother left and hitchhiked back to a bar, where they picked up some whiskey and caught a ride home.

On May 31, 1984, the George brothers both appeared at the Navajo Division of Public Safety headquarters and asked to make a statement about what happened at the time Herman John Kellywood was killed. Samuel George then stated, "It was me, not my brother." Officer Lee then requested Special Agent Felter assist in taking a written statement from Samuel George. Special Agent Felter read Samuel George his *Miranda* warnings prior to taking a statement. The statement signed by Samuel George stated:

> On Saturday night, May 19, 1984, my brother, Kenneth George, and I had been drinking and were walking east near the irrigation ditch. We were with another guy whose name I do not know. My brother was walking in front of us and this unknown fellow and I got into an argument over beer. He kicked me and threw a rock at me and we got into a fight. The last thing I remember that I was sitting on top of him in a field and then I blacked out. The next thing I remember was my brother hollering at me and telling me to 'stop hitting him and let's go.'
>
> This incident took place in a field by the irrigation ditch below a pink house which was on top of the hill in Shiprock west of the Hogback.
>
> I read this statement and it's true and correct. No promise or forced (sic) have been used against me to make this statement.

A federal grand jury indicted Samuel George on June 27, 1984, on charges of voluntary manslaughter for the unlawful taking of the life of Herman John Kellywood pursuant to 18 U.S.C. §§ 1153 and 1112. Following a four-day trial, the defendant, Samuel George, was found guilty by a jury's verdict on September 13, 1984, and was sentenced pursuant to the Youth Corrections Act on October 16, 1984. 18 U.S.C. §§ 4216 and 5010(b).

The six asserted grounds of error are hereafter discussed as set out in defendant-appellant's brief.

1. When the government waits until the defense has committed itself in the eyes of the jury to self-defense, and then discloses that there is evidence that another person committed the killing, the defendant has been irrevocably prejudiced.

Darrel Yazzie was called as a witness by the defense. Yazzie testified that on the night Herman John Kellywood was killed, he was riding on a motorcycle with Patrick "Bear Claw" Harvey in the Hogback vicinity. They met Herman John Kellywood and the three of them talked and drank beer for a while until Kellywood asked permission to borrow the motorcycle to obtain more beer. On Kellywood's return, the three young men continued their beer drinking on the side of the road with Samuel George and Kenneth George, who had arrived in the interim.

Samuel George and Patrick "Bear Claw" Harvey then made another trip on the motorcycle to get more beer for the group. Kenneth George, Yazzie and Kellywood remained in the field near Kellywood's Hogback home. Kenneth George then began demonstrating his ability in the use of nunchaku, he had been wearing around his neck, to Yazzie and Kellywood. Yazzie testified Kenneth George was not threatening either him or Kellywood with the nunchaku.

The Navajo police had interviewed Darrel Yazzie in advance of trial. Officer Daniel Lee made notes of the interview which, in pertinent part, related:

> Darrel Yazzie said while Samuel and Patrick were gone, Kenneth George, Herman J. Kellywood and he stayed behind. At that time, Kenneth was being loud and swinging some knung-chucks [sic] around. He was also talking about a house that burn [sic] down north [sic]

Kenneth George's residence, saying that the Police kept coming around asking him questions about it. That whole time while waiting for the other two (2) [sic] to return, Kellywood, Herman J. was falling down and crawling around.

The record reveals this was the only information relating to the nunchaku available to the government in advance of trial. This information was disclosed to the defendant after the first day of trial for use in cross-examination and prior to the defendant introducing any evidence.

The defendant-appellant argued that the evidence of Kenneth George's use of the nunchaku was exculpatory and he was seriously prejudiced in not being provided with this evidence prior to trial, particularly in light of the fact it was not provided until defendant-appellant's counsel had committed to a defense of self-defense in opening statement.

A review of the opening statement of defense counsel clearly indicates counsel was equivocal and "vague" in this regard. The following excerpt of counsel's opening statement on behalf of the defendant-appellant evidences this strategy:

> The defense here, among other things, will contend that if Samuel George is responsible for the death that it was in his own defense or in defense of his brother Kenneth that he did that.
>
> Now, I've been a little vague about some of these things. I said if it shows that Samuel is responsible for the death and I've said a few other ifs. The problem is that the evidence is going to show that everybody there was so drunk and the situation was so confused about which of the three principals that we've discussed, or perhaps even others, did what, that there are no eyewitnesses, that there are no credible witnesses to what really happened out there.

An excerpt from the defendant-appellant's closing statement shows that it was argued that Samuel's brother Kenneth could have caused Kellywood's death with the use of the nunchaku. In closing, the argument was made:

Now let's make a little bit different assumption here. Let's think about Kenneth a little bit, Samuel's brother. Kenneth had the weapon. If you can bring yourself to look at the gory pictures, the disgusting pictures taken of the dead person sometime after his death, after rigor mortis has set in, after he began to get all bloodied up and everything and focused just on the injuries, which are terrible themselves, you will see that they were inflicted by various kinds, possibly inflicted by various kinds of things, possibly some kind of rock, or as the Doctor said, maybe something flat like the flat side of the rock or even the flater (sic) other side of the rock or the edge of the rock which is harder and would go in better, just like a stick traveling at the tremendous velocity of a nunchuck, the weapon that Samuel had. Excuse me. This is the kind of confusion that could have prevented these things. The weapon that Kenneth had. It is undisputed, absolutely undisputed that Kenneth had an actual weapon, not just a rock that happened to be laying in the field, an actual weapon that I believe you will conclude could have inflicted the death dealing blows.

■ The disclosure required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is not a rule of discovery. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). Rather, it is a rule of fairness and the constitutionally minimal prosecutorial obligation.

In *United States v. Jackson,* 579 F.2d 553 (10th Cir.1978) this court discussed the prosecution's obligation under *Brady* when only a general *Brady* request has been made. In *Jackson,* it is stated: "The Constitution does not demand complete disclosure of the prosecutor's files. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Jackson, supra,* 579 F.2d at 560. The

court also recognized that under *Agurs* the burden is on the defendant to establish the failure to disclose was violative of his due process rights.

The standard for materiality when a general request for *Brady* information, as here, has been made is:

[U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose ... But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.

427 U.S. at 108, 96 S.Ct. at 2399.

■ The government's obligation to disclose *Brady* material is contingent on three factors: (a) a request for exculpatory material by the defense; (b) the evidence being favorable to the defense; and (c) the materiality of the evidence. *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706, *reh. den.* 409 U.S. 897, 93 S.Ct. 87, 34 L.Ed.2d 155 (1972). In the recent case of *United States v. Bagley*, — U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court has provided the most current analysis of the *Brady* exculpatory evidence disclosure requirement. Therein, it is stated:

The Court has relied on and reformulated the *Agurs* standard for the materiality of undisclosed evidence in two subsequent cases arising outside the *Brady* context. In neither case did the Court's discussion of the *Agurs* standard distinguish among the three situations described in *Agurs*. In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 [102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193] (1982), the Court held that due process is violated when testimony is made unavailable to the defense by Government deportation of witnesses 'only if there is a reasonable likelihood that the testimony would have affected the judgment of the trier of fact.' And

in *Strickland v. Washington*, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Id.,* at [——, 104 S.Ct.at 2068]. The *Strickland* Court defined a 'reasonable probability' as 'a probability sufficient to undermine confidence in the outcome.' *Ibid.*

We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

However, *Brady* applies in cases involving "... defendant's discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397. Herein, the defendant-appellant received the contended exculpatory material on the evening at the close of the first day of trial. The defendant-appellant had the information in sufficient time to cross-examine each government witness, use it in the presentation of his own case, introduce expert testimony concerning the purpose and use of the nunchaku and effectively weave this evidence into his closing statement in support of reasonable doubt.

■ This court has previously held that *Brady* is not violated when the Brady material is made available to defendants during trial. *United States v. Alberico*, 604 F.2d 1315, 1319 (10th Cir.1979) and *United States v. Behrens*, 689 F.2d 154, 158 (10th Cir.1982). The relevant standard

of materiality does not focus on the trial preparation, but instead on whether earlier disclosure would have created a reasonable doubt of guilt that did not otherwise exist. *United States v. Agurs, supra*, 427 U.S. at 112 n. 20, 96 S.Ct. at 2401 n. 20; *United States v. Behrens, supra*, 689 F.2d at 158; and *United States v. Alberico, supra*, 604 F.2d at 1319. The record herein and the foregoing analysis establishes the defendant-appellant was not denied due process or a fair trial in this regard. As the evidence was produced, it is not necessary to judge its materiality as recently expressed in *Bagley*.

■ Further, Officer Lee's report was not required to be disclosed in advance of trial under the provisions of the Jencks Act, 18 U.S.C. § 3500. Darrel Yazzie was interviewed as a government witness, but the government did not call him in its case in chief. He was called as a witness by the defense. Absent exculpatory material in keeping with *Brady* and *Bagley*, there was no obligation to produce the Darrel Yazzie statement obtained by Officer Lee as discoverable material under Fed.R.Crim.P. 16.

    2. What is the remedy when the only available eyewitness has made statements favorable to the defendant, but invokes his right not to testify because he himself may be incriminated?

    A. Allowing the jury to know of the invocation of privilege.

    B. Presentation of the brother's statement.

The defendant desired to call his brother, Kenneth George, as a witness on his behalf. The trial court permitted the defendant to call his brother as a witness, outside the hearing of the jury, for the purpose of determining if Kenneth George would invoke his Fifth Amendment privilege against self-incrimination. At the time, Kenneth George was represented by separate counsel. When questioned regarding the events of the evening of Herman John Kellywood's death, Kenneth George refused to answer the questions and asserted his right against self-incrimination. The trial court permitted the Fifth Amendment assertion by Kenneth George and then ruled the defendant-appellant would not be permitted to call Kenneth George as a witness solely for the purpose of having him invoke the Fifth Amendment privilege in the presence of the jury. The trial court's ruling in this regard was in accordance with previous pronouncements of this court. *United States v. Crawford*, 707 F.2d 447 (10th Cir.1983); and *United States v. Martin*, 526 F.2d 485 (10th Cir. 1975).

The trial court then gave a cautionary instruction to the jury that "You are not to draw any inferences at all from the failure of either party to call any eye witness to the incident to testify as part of his or its case."

The defendant-appellant urges that the authority stating a witness should not claim his privilege against self-incrimination to the jury is distinguishable, because none of it is based on a situation like the present one wherein there is the defendant's compelling need for presenting the information as the only way available to vindicate his rights to due process and compulsory process. It is also argued that this case falls into the small subcategory of cases where the presentation is needed to dispel the negative inference that would be drawn from not calling the only eyewitness, the defendant's brother, rather than create an adverse inference for which the cases often rebuke prosecutors.

The defendant-appellant further contends that by not permitting him to call his brother, Kenneth George, as a witness for the purpose of his asserting his Fifth Amendment privilege before the jury, he was deprived of his right of compulsory process under the Sixth Amendment. Such a claim has been previously resolved against the defendant-appellant in the following cases: *Murdock v. United States*, 283 F.2d 585 (10th Cir.1960); *United States v. Trejo-Zambrano*, 582 F.2d 460 (9th Cir.1978); *United States v. Gay*, 567 F.2d 916 (9th Cir.1978); *Royal v. Maryland*, 529 F.2d 1280 (4th Cir.1976).

In the case of *United States v. McClure,* 734 F.2d 484, 491 (10th Cir.1984), this court stated: "If in fact the invocation of the Fifth Amendment privilege is of such dimension that it permits no inference of guilt or innocence, it is without probative value on the issue of defendant's guilt or innocence." *McClure* held that a defendant's Sixth Amendment confrontation rights were not impaired by his being prevented from commenting on a co-defendant's silence. *McClure* stated the reasonable alternative to the defendant was to take the witness stand and lay the blame on a nontestifying co-defendant, rather than argue self-serving implications regarding a co-defendant's silence.

■ The trial court correctly permitted the invocation of the Fifth Amendment privilege by Kenneth George outside the hearing of the jury, and defendant-appellant's right of confrontation under the Sixth Amendment was not thereby violated.

Alternatively, the defendant-appellant sought to present his investigator's account of what Kenneth George told him about the events surrounding Kellywood's death. It was proffered that Kenneth George told the investigator that he had heard the deceased yell angrily; he turned and saw the deceased kick Samuel George, knock him down and sit on him; he went to them and pushed the deceased off his brother; a scuffle ensued between Kenneth and the deceased; and then Kenneth blacked out. The defendant-appellant urges due process, as well as Fed.R.Evid. 804(b)(3), 804(b)(5) and 803(24),[2] compelled admission in evidence of the investigator's synopsis.

Kenneth George made numerous statements to those who were investigating the death of Herman John Kellywood. On May 30, 1984, Kenneth George told the FBI agent that he did not know anything about the killing of Herman John Kellywood. On May 31, 1984, Kenneth George made a statement to the FBI which implicated his brother in the death of Herman John Kellywood. (This statement corroborated the

**2.** Fed.R.Evid. 804(b)(3)

(b) Hearsay exceptions. The following are *not excluded by the hearsay rule if the declarant is unavailable as a witness:*

\* \* \* \* \* \*

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

\* \* \* \* \* \*

(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the

adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 803(24)

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

signed statement of Samuel George discussed herein at pages 558–559. On July 12, 1984, Kenneth George told the defendant's investigator that he saw Kellywood kick and hit Samuel George. On July 19, 1984, Kenneth George told the FBI agent that he had lied to the defense investigator because he was afraid of his brother. On August 23, 1984, in an interview in the United States Attorney's office, he again told the story that Kellywood was fighting with the defendant-appellant and was on top of him at the time Kenneth George blacked out.

The trial court made a finding that the synopsis was not admissible as the corroborating circumstances did not clearly indicate the trustworthiness of the statement. Each of the Federal Rules of Evidence sections relied upon by the defendant-appellant for admission of the investigator's synopsis, have as a common element the requisite trustworthiness. The prior contradictory statements given by Kenneth George concerning the incident support the trial court's finding of lack of trustworthiness.

■ In the case of *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Supreme Court recognized that a mechanistic application of the rule excluding hearsay could result in a denial of justice if the excluded evidence "bore persuasive assurances of trustworthiness" and was critical to the defendant's case. 410 U.S. at 302, 93 S.Ct. at 1049. The constitutional concern is for "the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), *quoting California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970). As the trial court properly found the subject hearsay synopsis given by Kenneth George did not bear the persuasive assurances of trustworthiness, therefore no right of constitutional dimension of the defendant-appellant was violated.

3. Additional undisclosed investigative reports must be examined.

The principal investigating officer, Officer Daniel Lee of the Navajo Division of Public Safety, produced, pursuant to the trial court's order, tablets on which he had made preliminary notes during the investigation. These tablets had not been provided to the government previous to the court order. Officer Lee testified that the information contained in the tablets was completely incorporated in the typewritten reports provided to the defendant before trial. The tablets contained references to numerous cases under investigation other than the instant case.

■ The trial court reviewed the notes in the tablets that were pertinent to the instant case *in camera*. The trial court concluded, as has this court from its own *in camera* inspection, that the information on the tablets concerning the instant case had been included in formal typewritten reports provided to the defendant-appellant before trial. As the information had already been disclosed to the defendant-appellant, and the subject tablets contained notes concerning numerous investigations of cases not relevant herein, the trial court did not err in denying disclosure of the subject tablets.

4. It was proper to ask a character witness if he had heard of the subject's arrest.

Leonard Phillip, a long-time friend of the deceased, Herman John Kellywood, was called as a rebuttal witness on behalf of the government relative to the character trait of peacefulness or the absence of violence. Phillip testified that he occasionally drank with Kellywood and on no occasion, either drunk or sober, did he see Kellywood get violent.

Just prior to resting his case, the defendant-appellant, outside the hearing of the jury, offered Defendant's Exhibit Q, which was the Navajo Tribe Office of Law Enforcement criminal history record of the deceased, Herman John Kellywood. Defendant's Exhibit Q was offered as evi-

dence that Herman John Kellywood had a propensity for violence.

The following dialogue between the court and counsel for the defendant-appellant indicates the defendant-appellant's theory of admissibility and the court's rejection of the offer of proof:

MR. BOULT: Over all it shows a style of life that lends itself to violent encounters. Alternatively, I would ask—

THE COURT: A style of life that lends itself to what?

MR. BOULT: Violent encounters.

THE COURT: For example, what, no driver's license, DWI, failure to exercise due care, speeding, disorderly conduct, speeding? Well, I disagree with you on that.

MR. BOULT: With the exception of speeding, that number of arrests over a period of time I think is relevant.

THE COURT: Well, I disagree. I'm going to—

MR. BOULT: Alternatively, I would ask that the convictions for offenses that more clearly indicate a violent nature be introduced, that the rest of it be allotted.

THE COURT: There are—there is not one charge here listed in the 22 which to me is indicative or probative in reference to violent character. We have, number one, no driver's license; number two, warrant, no driver's license; three, disorderly conduct, that could be anything. Speeding, disorderly conduct, again that could be anything, DWI, speeding, failure to exercise due care, speeding, DWI, DWI, public intoxication, warrant, DWI, warrant, criminal damage, escape from lawful custody, endangering the welfare of a minor, that might come close but again that could be anything. No driver's license, possession of liquor, public intoxication, no driver's license, public intoxication, public intoxication.

Not one charge in there so far as I can see points to or is indicative of a violent character. The objection will be sustained.

Alternatively, defendant-appellant requested that the convictions for offenses that more clearly indicate a violent nature be received in evidence. For the reasons stated, the court sustained the objection to Defendant's Exhibit Q.

On cross-examination of the witness Phillip, counsel for defendant-appellant asked, "Do you know that Herman Kellywood had over 20 tribal arrests?"

Out of the hearing of the jury, the trial judge advised counsel that he construed the question as attempting to get before the jury the information in the criminal arrest history which he had just previously informed counsel as being inadmissible. Ultimately, the court advised counsel for defendant-appellant he was holding him in contempt of court and would address the subject further following the trial. The next day, following the jury verdict, the court rescinded its contempt order against counsel for defendant-appellant.

■ The court advised the jury to disregard defendant-appellant's question of witness Phillip if he knew that Herman Kellywood previously had over 20 tribal arrests. The trial court did not err in this regard because the arrests were not probative of the character trait at issue, i.e., peacefulness or the lack of violence. *Michelson v. United States,* 335 U.S. 469, 480, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948).

5. Whether the defendant and his counsel are entitled to see the entire presentence report except for the Probation Officer's recommendation.

Before sentencing the defendant was permitted to review the presentence report prepared by the Department of Probation with the exception of the part concerning sentencing recommendation and a completed form captioned U.S. Probation Officer's Parole Guideline Worksheet. The relevant information thereon is as follows: Name of defendant, docket number, date, offense severity rating category, salient factor score (numerical scoring of six relevant factors in the defendant's history), the applicable guidelines (adult or youth), estimated guideline range in months, and a statement concerning particularly aggra-

vating or mitigating factors, which is optional.

The probation officer's parole guideline worksheet contains a caveat which states: "The following is only an *estimate* of the parole guideline range as the U.S. Parole Commission will compute the actual parole guideline range at the time of the parole hearing."

Counsel for the defendant-appellant requested a copy of the probation officer's parole guideline worksheet, but the trial court declined the request upon the probation officer's statement that it was not routinely provided because it contained just general information for the court.

The applicable rule is Fed.R.Crim.P. 32(c)(3)(A) which states:

At a reasonable time before imposing sentence the court shall permit the defendant and his counsel to read the report of the presentence investigation exclusive of any recommendation as to sentence, but not to the extent that in the opinion of the court the report contains diagnostic opinions which, if disclosed, might seriously disrupt a program of rehabilitation; or sources of information obtained upon a promise of confidentiality; or any other information which, if disclosed, might result in harm, physical or otherwise, to the defendant or other persons. The court shall afford the defendant and his counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

■ While in the instant case it is not deemed error requiring a resentencing of the defendant-appellant (Youth Corrections Act, 18 U.S.C. §§ 4216 and 5010(b)), it is believed the trial court should permit the defendant and his counsel to read this information prior to sentencing. Fed.R. Crim.P. 52(a). A trial court may attach some significance in sentencing to the historical information and numerical assessment on the guideline worksheet, so the defendant-appellant should have an oppor-

tunity to review and comment thereon. There is the possibility the probation officer may make an innocent mistake in the numerical assessment in arriving at the salient factor score or the estimated guideline range in months. If the document is maintained in the file by the Parole Commission, it should be made available for review by the defendant-appellant herein. The parole guideline worksheet in question has no information on it that is excluded by Fed.R.Crim.P. 32(c)(3)(A).

6. Whether an expert qualified in the use of a particular weapon can testify that wounds are consistent with having been inflicted by that person.

Kerry Li was called by the defendant as an expert in martial arts and particularly in the use of the nunchaku. His qualifications as an expert concerning the nunchaku were accepted.

Over objection of the government, the witness was not allowed to testify that the nunchaku Kenneth George carried could have inflicted the wounds that caused Herman Kellywood's death. An offer of proof supported that he would have so testified. Witness Kerry Li was not qualified as an expert in the field of medicine or related scientific discipline. The trial court denied the proffer because the witness had not been qualified as an expert in reference to the actual damage that these nunchucks can or might inflict and further because there was no testimony concerning the specific construction of the nunchaku which Kenneth George had with him at the time.

■ The trial court has broad discretion in assessing the qualifications of a witness to express an opinion as an expert. *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 863 (10th Cir.1979); *Salem v. U. S. Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); and *Padgett v. Buxton-Smith Mercantile Co.,* 262 F.2d 39 (10th Cir.1958).

■ The record herein does not support the contention that the trial court abused its discretion in refusing to allow witness Kerry Li to express his opinion that the wounds of Herman Kellywood were con-

sistent with nunchaku-inflicted wounds. F.R.E. 701.

The judgment and sentence of the trial court is hereby affirmed.