DECISION
This is an appeal by defendant, Darry K. Woods, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of aggravated burglary, aggravated robbery and kidnapping.
On December 11, 1998, defendant was indicted on three counts of aggravated murder, in violation of R.C. 2903.02, one count of attempted aggravated murder, in violation of R.C. 2923.02 and 2903.01, one count of aggravated burglary, in violation of R.C. 2911.11, one count of aggravated robbery, in violation of R.C. 2911.01, and one count of kidnapping, in violation of R.C. 2905.01. The matter was tried before a jury beginning on January 18, 2000.
This case arose out of the shooting death of Kenneth Coleman on September 8, 1997. Coleman resided at 1261 Mooberry Street, Columbus, with Todne Williams. Williams was also shot during the incident, but she recovered from her wounds and testified at trial on behalf of the prosecution. Under the state's theory of the case, two individuals, the defendant and David Clinkscale, were responsible for Coleman's death. Prior to defendant's trial, Clinkscale was tried separately and convicted of aggravated murder, aggravated burglary, robbery and kidnapping in connection with Coleman's death. Clinkscale and defendant were from Youngstown, Ohio; Coleman also grew up in Youngstown before moving to Columbus, and Clinkscale and Coleman were long-time acquaintances.
The evidence indicated that Coleman was a drug dealer. Coleman also gambled, and he raised pit bulls to enter in illegal dogfights. On Saturday, September 6, 1997, Clinkscale and defendant went to Coleman's residence to meet with Coleman; the three men had arranged to travel together to Kentucky with a group of other individuals to observe a dogfight in which Coleman was entering one of his dogs. The group of men, which included Clinkscale, the defendant, Coleman, and Pete Davis, drove from Columbus to Kentucky that afternoon. On Saturday evening, after checking into a hotel room, the group went to a rural location where the dogfight was held. In the early morning hours of September 7, 1997, the dogfight came to an abrupt end after a disagreement between the dog owners over the outcome.
The men returned to the hotel, checked out and then drove back to Columbus. The state presented testimony that Clinkscale and defendant went to Coleman's house later that evening to gamble on video games. Todne Williams testified that, earlier that evening, Coleman told her that he was planning to play video games at the house with "David Clinkscale and Woods." (Tr. at 322.) Later that night, Williams opened the door for two men; Coleman and the two men played video games downstairs, and Williams eventually went to bed upstairs. Williams was later awakened by the sound of a weapon firing.
Williams gave the following testimony regarding the events that next transpired. After the shot was fired, Williams heard someone approaching her bedroom. Clinkscale entered the room with a gun, pointed the weapon at her and asked, "where is the money?" (Tr. at 323.) Williams responded that she did not know what he was talking about. Clinkscale called for "the second person to come up," and Clinkscale told this individual to hold the gun on her. (Tr. at 323.) At trial, Williams identified the defendant as the individual who came up to the room. Williams then pointed to a safe, and Clinkscale took the safe downstairs.
Clinkscale subsequently returned to the bedroom, took the gun from defendant, and told Williams to go downstairs. Coleman was lying on the floor in a downstairs room; he had been shot in the head. Clinkscale again handed the gun to defendant, and Clinkscale went outside for a brief period of time. Defendant told Williams that he was not going to hurt her. Clinkscale returned, took the gun from defendant, and told Williams to lay down beside her husband. Williams, however, began to run toward the back door of the residence with Clinkscale in pursuit. Williams testified that, "by that time, Woods was outside." (Tr. at 325.) Clinkscale fired at least three shots during this time, hitting Williams in the face and arms.
Clinkscale then fled the residence, and Williams, despite being wounded, managed to call 911 for assistance. An emergency squad transported Williams to a hospital for treatment. Coleman was pronounced dead at the scene.
During cross-examination, Williams indicated that she had testified at Clinkscale's earlier trial. Williams acknowledged that, during her testimony in that trial, she referred to the other individual involved in the incident with Clinkscale as "that boy," and she never identified him as Woods. (Tr. at 430.)
The record indicates that, at the time of Clinkscale's trial, defendant had not been arrested in connection with the death of Coleman. Williams subsequently identified defendant as a suspect after observing a photo array prepared by police detectives. Detectives linked defendant to the incident in part based on the fact that a hotel registry indicated that, on September 6, 1997, an individual named Darry K. Woods had checked out of room 204 at the Holiday Inn on James Road, Columbus. Detectives had previously found a piece of paper in Coleman's house containing the words "Holiday Inn James 204 Silk." (States Exhibit D2.) The evidence indicated that Clinkscale often went by the nickname of "Silk."
At trial, defendant testified on his own behalf. Defendant acknowledged that he had accompanied his cousin, Clinkscale, to Columbus in September 1997, and that they went there with the purpose of accompanying Coleman to a dogfight in Kentucky. They arrived in Columbus on September 2, 1997, a Tuesday, and checked in at a Holiday Inn. On Wednesday, Thursday and Friday of that week, defendant and Clinkscale went to various nightclubs in Columbus. According to defendant, he met Coleman for the first time on Wednesday of that week.
On Saturday morning, Clinkscale and defendant went to Coleman's house, where defendant met Todne Williams for the first time. A group of approximately twelve or thirteen individuals went to Kentucky that day for the purpose of attending the dogfight. Defendant traveled in a minivan with Clinkscale, Coleman, an individual identified as "G-Money," and another individual named Pete. After arriving in Kentucky, the group checked into a hotel room.
Later, at approximately 9:00 p.m., the group drove to a remote location in a wooded area, where the dogfight was conducted inside a barn. The dogfight lasted until approximately 3:00 a.m. Because of a controversy that arose near the end of the dogfight, money was returned to individuals who had placed bets.
The group then returned to the hotel in Kentucky. According to defendant, "G-Money" and Coleman had an argument following the dogfight. Clinkscale and defendant gave "G-Money" a ride back to Columbus. After dropping off G-Money at a location in town, Clinkscale and defendant went back and checked in at the same Holiday Inn in Columbus where they had stayed that week.
Defendant testified that, on Sunday morning, they checked out of the hotel around noon, visited some friends in Columbus until approximately 2:00 p.m., and then drove back to Youngstown. After arriving in Youngstown, Clinkscale stopped at the home of Brian Fortner for approximately twenty minutes. Defendant then arrived at his home at approximately 6:00 p.m. According to defendant, he ate dinner with his girlfriend, Dawn Lockett, and then went to the home of his parents at approximately 7:15 p.m. Defendant's father was there, but his mother was at church. Later, defendant went to his sister's house, and helped his brother-in-law install a car stereo. At approximately 9:00 p.m., defendant drove to the home of a friend, Jerome, and they went to some local bars. Defendant testified that he returned home to his girlfriend at approximately 2:30 a.m.
At trial, defendant presented alibi testimony from his girlfriend, his father and his brother-in-law. These individuals testified about defendant's purported whereabouts on the night Coleman was shot.
On January 28, 2000, the jury returned verdicts finding defendant guilty of kidnapping, aggravated robbery and aggravated burglary. The jury found defendant not guilty of aggravated murder and attempted aggravated murder. The trial court sentenced defendant by judgment entry filed on February 8, 2000.
On appeal, defendant sets forth the following three assignments of error for review:
 1. FAILURE OF PROSECUTING ATTORNEY TO PROVIDE IN DISCOVERY PRIOR TO TRIAL THE TAPE OF THE EYEWITNESS DURING HER FIRST IDENTIFICATION CONSTITUTED PROSECUTORIAL MISCONDUCT.
 2. THE COURT ERRED IN FAILING TO GRANT APPELLANT'S MOTION FOR MISTRIAL AFTER CROSS-EXAMINATION BY THE PROSECUTING ATTORNEY USING TRANSCRIPT OF THE CO-DEFENDANT'S TRIAL AND SUCH NOT BEING SUBJECT TO CROSS-EXAMINATION.
 3. THE ACTIONS OF THE PROSECUTING ATTORNEY IN QUESTIONING THE APPELLANT ON CROSS-EXAMINATION ABOUT STATEMENTS MADE IN A TRIAL OF A CO-DEFENDANT CONSTITUTED PROSECUTORIAL MISCONDUCT.
Under his first assignment of error, defendant contends that the prosecution engaged in misconduct by failing to provide, prior to trial, an audiotape recording of an interview of Todne Williams conducted by Columbus Police Detective Robert Viduya. During this interview, conducted on October 27, 1998, Williams first identified defendant as a suspect. Defendant notes that Williams subsequently testified during a pre-trial motion to suppress, at which time she claimed that she was "one hundred percent" certain that defendant was the second perpetrator of the crime when the detective first showed her defendant's photograph. Further, Williams testified at trial that she was "one hundred percent" certain regarding her identification of defendant.
During the trial, the state informed defense counsel of the existence of an audiotape of the interview between the detective and Williams. Defendant argues that the tape revealed that Williams never stated at the time of that interview that she was "one hundred percent" certain of the identification. Defendant argues that the failure of the state to turn over the tape prior to trial constituted prosecutorial misconduct and denied him due process of law. Defendant maintains that it is no defense for the state to assert that it was unaware of the tape until after discovery.
In State v. Wickline (1990), 50 Ohio St.3d 114, the Ohio Supreme Court addressed a contention by a criminal defendant that the state's failure to provide certain records prior to trial mandated a new trial. The court, in Wickline, rejected the defendant's contention, holding in part:
 * * * [I]n Brady v. Maryland (1963), 373 U.S. 83, 87, the United States Supreme Court held that:
 "* * * The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
 However, in United States v. Agurs (1976), 427 U.S. 97, 103, it was stated:
 "The rule of Brady * * * arguably applies in three quite different situations. Each involves the discovery, after trial, of infor-mation which had been known to the prosecution but unknown to the defense." (Emphasis added.)
 As the alleged exculpatory records were presented during the trial, there exists no Brady violation requiring a new trial. [Emphasis sic. Id. at 116.]
Similarly, in the instant case, the tape at issue was produced during trial, and the record indicates that the tape was played for the jury. Thus, the jury was made aware that Williams did not, at the time of the interview with the detective, indicate that she was "one hundred percent" certain regarding the identification.
Further, we agree with the state that the information on the audiotape is not exculpatory. Specifically, the tape reveals that Williams, after being shown the photo array, stated, "I believe thats [sic] him." (Defendant's Exhibit 111, at 3.) She further stated to the detective during the interview, "that [sic] the guy right there. I can tell by the eyes." (Defendant's Exhibit 111, at 4.) Thus, the instant case does not involve a situation in which the witness was unable to identify an accused or misidentified an accused. Rather, while Williams did not, during the taped interview, assign a percentage (i.e., one hundred percent) as to her certainty, she identified defendant from the picture as the perpetrator of the crime. While Williams' failure to indicate she was "one hundred percent" sure of her identification during the interview might arguably go to the weight of her subsequent statements regarding the degree of her certainty, the failure of a witness to make a "one hundred percent" identification is not, per se, exculpatory.
Finally, we note that the information at issue was revealed in sufficient time during the trial so that the detective and Williams could have been called back for further cross-examination. The record indicates that the trial court, prior to playing the tape, informed the jurors that, "rather than call Detective Viduya back here to the trial today to engage in further cross-examination, which defense reserved the right to do, * * * the parties have stipulated that rather than go through that process of calling him back here, simply agree to play the tape for you." (Tr. at 669.) The trial court also noted that defense counsel had not only reserved the right to call the detective back to the stand, but that counsel also "reserved the right to recall Todne [Williams]." (Tr. at 643.) Thus, under the circumstances of this case, including the fact that disclosure was made in time for defense counsel to conduct cross-examination of the relevant witnesses had counsel so chosen, defendant has failed to show the denial of his right to a fair trial. SeeUnited States v. George (C.A.10, 1985), 778 F.2d 556, 561 (defendant was not denied due process or a fair trial where he "received the contended exculpatory material on the evening at the close of the first day of trial," and defendant "had the information in sufficient time to cross-examine each government witness").
Defendant's first assignment of error is without merit and is overruled.
Defendant's second and third assignments of error are interrelated and will be discussed together. Under his second assignment of error, defendant argues that the trial court erred in failing to grant a mistrial following the prosecutor's cross-examination of defendant. Under his third assignment of error, defendant argues that the actions of the prosecutor in questioning defendant about statements of a co-defendant, David Clinkscale, made during Clinkscale's trial, constituted prosecutorial misconduct.
In general, "[t]he granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." State v. Treesh (2001),90 Ohio St.3d 460, 480, citing Crim.R. 33 and State v. Sage (1987),31 Ohio St.3d 173, 182. In Treesh, the court also noted the standard for prosecutorial misconduct:
 * * * [T]he standard for prosecutorial misconduct is whether the comments and/or questions were improper, and, if so, whether they prejudiced appellant's substantial rights. State v. Lott
(1990), 51 Ohio St.3d 160, 165 * * *. Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." State v. Acre (1983), 6 Ohio St.3d 140, 145 * * *. Trial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation. See Delaware v. Van Arsdall
(1986), 475 U.S. 673, 679 * * *. [Id. at 480-481.]
In his brief, defendant quotes lengthy portions of the trial transcript in arguing that the prosecutor engaged in improper questioning of defendant during cross-examination. For purposes of review, we will focus on three specific exchanges between the prosecutor and defendant cited in defendant's brief.
Defendant argues that, in the following exchange, the prosecutor improperly questioned defendant about alleged drug dealing activity involving defendant and Clinkscale:
 Q. Okay. Isn't it true that you and Silk brought a half a key down to sell to Ike?
A. No.
[Defense counsel]: I'd object.
Q. That's not true?
[Defense counsel]: I would object.
THE COURT: Reasonable basis?
[Prosecutor]: Sure do.
THE COURT: Overruled.
Q. That's not true?
A. No.
Q. David Clinkscale wasn't the dope man?
A. Like I said, I don't know what he did.
Q. Ike wasn't the one buying half a key?
A. I don't know.
Q. Ike wasn't one of Silk's regular customers?
A. I do not know. [Tr. at 1173-1174.]
Later, the prosecutor questioned defendant regarding certain statements made by Clinkscale in his earlier trial:
Q. Is there any reason why your cousin Silk would protect you?
A. What do you mean?
 Q. What do I mean? The allegation in this case is that you and Silk went to Columbus, then Cincinnati, and then back to Columbus, and then in the early morning hours from Sunday into Monday, killed Kenneth Ike Coleman.
A. Correct. Well, the accusation now.
Q. That's the allegation.
A. Now it is, yes.
* * *
 Q. So my question to clear up your question — or my answer clearing up your question to me, which was, why would I think that, is the allegations are that now —
A. Yes.
 Q. — you and Silk went there, went back to Columbus after the dogfight and killed this guy on the early morning hours of Monday morning; you understand that now?
A. Now, yes.
 Q. My question is, is there any reason why, or does — not is there any reason why, but does your cousin David, Silk, want to protect you?
A. I don't think so. [Tr. at 1182-1185.]
Following this exchange, defense counsel made an objection and a discussion between counsel and the trial judge was held outside of the hearing of the jury. During the discussion, defense counsel asserted that the trial court had "made a ruling last night that he wasn't to get into that." (Tr. at 1188.) In response, the trial judge stated that the prosecutor could ask the question "if he has any reasonable basis for the belief of the fact." (Tr. at 1188.) The trial judge further stated, however, that, if the prosecutor "didn't have any reasonable basis to believe the fact or any possibility that it would come into evidence, you can't just fire away at things so the jury hears them in a question." (Tr. at 1188.) After further discussion, during which defense counsel asserted that the prosecution was attempting to attack defendant's credibility with the transcript of a witness from a different trial, the trial court indicated that it would allow the prosecutor's question.
Thereafter, the following colloquy took place between the prosecutor and defendant:
 Q. It was you and not Jerome that came with your cousin Silk to Columbus, to the dogfight, back to Columbus, and then to Youngstown; correct?
A. Correct.
 Q. Are you aware that your cousin said it was Jerome that came with him?
[Defense counsel]: Object for the record, Your Honor.
THE COURT: Overruled.
 Q. Are you aware that your cousin Silk said it was Jerome and not you that came with him?
A. No, I'm not.
 Q. Can you think of any reason why your cousin Silk, who you before said was not protecting you —
A. Correct.
 Q. — would say, would leave you out and include Jerome when in fact you're telling this jury that it was you?
A. No, I don't. [Tr. at 1192.]
During further cross-examination, the prosecutor questioned defendant regarding a purported alibi defense offered by Clinkscale in his prior trial:
 Q. * * * [Y]ou know that he's claiming he was in Youngstown at the time that Kenny Coleman was killed; correct?
A. I assume, he went to trial.
Q. Well, you've talked to him on the phone; correct?
A. Yes.
 Q. And you know that he maintains he was in Youngstown at the time of the homicide?
A. I said I don't know that.
 Q. He's told you that he did come back to Columbus from Youngstown?
A. I never said that.
Q. Well, you've talked about the case with your cousin; correct?
A. Correct.
 Q. And you know that he's saying he wasn't there at the time the guy was killed; correct?
 A. I assume, being that he went to trial. I didn't say we discussed that.
 Q. Well, you're aware of that from his family, aren't you, they were here during the trial?
 A. We didn't talk about his testimony, if that's what you're implying.
 Q. No, no, I'm not talking about whether you talked about his testimony, I'm talking about you were aware that he's claiming he was in Youngstown at the time Kenny was killed; correct?
A. I'm aware that he maintained his innocence, that's it.
Q. And that would mean that he wasn't in Columbus?
A. Correct.
Q. He was somewhere else; correct?
A. Other than Columbus, I guess.
Q. Correct. He was somewhere else other than Columbus —
A. Correct.
Q. — at the time; correct?
A. Correct.
Q. And that's an alibi —
A. I'd just —
Q. — just like the alibi you have; correct?
 [Defense counsel]: I object, alibi was never filed in that case and that's the basis of the appeal.
 THE COURT: Well, whether it was filed or not, the question was whether it is one or not. I didn't — he didn't ask the question —
[Defense counsel]: Judge didn't let in alibi.
[Prosecutor]: Hold on a minute.
THE COURT: Wait a minute, wait a minute, wait a minute.
* * *
 THE COURT: The objection is overruled and the jury will disregard counsel's statement, not consider it for — that accompanied the objection, not consider it for any reason whatsoever.
 Q. The fact is, sir, that your cousin is claiming he was somewhere other than in Columbus at the time Ike was killed, the same as you are maintaining you were not in Columbus at the time Ike was killed; correct?
A. Correct. [Tr. at 1197-1200.]
Following this final exchange, defense counsel made a motion for mistrial, asserting that the prosecutor was "basically arguing to the jury here * * * that your cousin had an alibi, you have the same alibi, the prior jury didn't believe your cousin's alibi, so why should they believe yours?" (Tr. at 1203.) The trial court declined to grant a mistrial, reasoning in part that "[i]t seems to me he's tied himself now to this cousin and the cousin made a claim that he wasn't even there." (Tr. at 1203.)
We will first address defendant's contention that the prosecutor improperly questioned defendant about alleged drug-dealing activity. As noted above, during cross-examination, the prosecutor asked defendant, "isn't it true that you and Silk brought a half a key (kilo) down to sell to Ike?" Defendant argues that the prosecutor's question placed in the juror's mind false information that defendant was a drug-dealer who went to Columbus with Clinkscale to sell half a kilo of cocaine to Coleman.
In general, "[i]t is improper for an attorney, under the pretext of putting a question to a witness, to put before a jury information that is not supported by the evidence." State v. Smidi (1993), 88 Ohio App.3d 177,183. Further, "[i]t is improper for an attorney to state any matter not supported by admissible evidence." Id. See, also, State v. Daugherty
(1987), 41 Ohio App.3d 91, 92-93.
In the instant case, our review of the record indicates that the above question propounded by the prosecutor assumed facts that were not in evidence. Specifically, while there was evidence that the shooting victim, Coleman, dealt in drugs, there was no evidence at trial indicating that defendant was involved in transporting drugs to Columbus (or that defendant had ever been involved in drug-dealing). Assuming that the prosecution possessed evidence on this issue, the state did not proffer such evidence as part of its case-in-chief. However, whether intentional or not, the prosecutor's question placed before the jurors insinuations of criminal conduct unsupported by the record.
We note that, despite overruling defense counsel's objection, the trial court apparently did not deem it necessary to test the "reasonable" or good-faith basis for the prosecutor's question; the court overruled the objection without asking the prosecutor to explain, at a side bar conference, his basis for the questioning. Nor did the prosecutor offer a good-faith basis to the court or attempt to present rebuttal evidence to refute defendant's denial of any involvement in transporting a kilo of drugs to Columbus to sell to Coleman. Although "defense counsel did not press the state to present its good-faith basis for asking this question, * * * that does not change the nature of the question asked and it does not render proper a question which was improper." State v. Hunt (1994),97 Ohio App.3d 372, 376. Rather, "[b]y virtue of the question, the prosecution, in effect, testified to events without bearing the usual burden of producing evidence of those events." Id. Further, having overruled the objection, the court never admonished the jury to disregard the prosecutor's "statement" in an attempt to cure any prejudicial effect caused by allusions to damaging facts not in evidence.
As noted above, defendant was also questioned about his knowledge as to Clinkscale's claim of alibi in his trial. The record indicates that, earlier during cross-examination, the prosecutor asked defendant if he was aware that Clinkscale had gone to trial and had been convicted of the charges brought against him. The prosecutor ended his questioning about Clinkscale's defense in his prior trial by stating, "[t]he fact is * * * that your cousin is claiming he was somewhere other than in Columbus at the time Ike was killed, the same as you are maintaining you were not in Columbus at the time Ike was killed." (Tr. at 1200.) We note that, in the instant action, evidence as to whether Clinkscale presented an alibi defense at his trial was not presented during the state's case, and the record indicates disagreement between defense counsel and the prosecutor as to whether Clinkscale relied on an alibi defense in the earlier trial.
Defendant argues that the prosecutor attempted to show that, because the jury in Clinkscale's trial disbelieved alibi testimony (that Clinkscale was in Youngstown during Coleman's murder) similar to alibi testimony offered by defendant, the jury in the instant case should likewise reject defendant's alibi defense. Upon review, we agree that there appears to be no other basis to have offered evidence that Clinkscale employed an alibi defense than to show that such defense was unsuccessful, thereby implicitly impugning defendant's own alibi defense. Regardless of the prosecutor's reason for inquiring into Clinkscale's purported alibi defense, we find the questioning to be irrelevant and improper. The present case essentially turned on the testimony of Todne Williams, who identified defendant, versus that of defendant, who presented alibi evidence. The issue of defendant's guilt or innocence was a matter for the jury to determine based upon the merits of the case. The fact that the jury, in Clinkscale's trial, may have rejected alibi testimony in rendering a guilty verdict was not relevant as substantive evidence for the jury to consider in determining defendant's guilt or innocence in the instant case. Here, where defendant's defense relied primarily on alibi testimony, the prosecutor's line of inquiry on cross-examination interjected the substantial danger of prejudice that the jury might be influenced by evidence of a co-defendant's unsuccessful alibi.
Finally, the trial court also permitted the prosecutor to question defendant about certain testimony by Clinkscale in his prior trial. Although the transcript of Clinkscale's trial was not made a part of the record on appeal, the prosecutor represented that Clinkscale purportedly testified that he went to Columbus with Jerome Wood (a cousin of defendant) rather than with defendant. The state points out the statement by Clinkscale was not prejudicial to defendant, because Clinkscale did not implicate defendant by testifying that he went to Columbus with someone other than defendant. However, while we would agree that the statement itself does not implicate defendant, the apparent basis for offering this statement was for the prosecutor to raise questions as to why Clinkscale would want to protect defendant.
Defendant asserts that the prosecutor engaged in this line of inquiry even though it was apparent to the state that Clinkscale would refuse to testify at defendant's trial. We note that, when defense counsel first objected to the prosecutor introducing the statement of Clinkscale, the trial court instructed the prosecutor as follows: "[I]f you have a reasonable basis that that evidence will come into this case regardless of what this witness's answer is, you may ask it. If you do not have a reasonable basis, belief that you can produce that evidence, or that it will be in this trial, you may not." (Tr. at 1149.) Further, following defendant's testimony, Clinkscale was brought before the trial court and, outside the hearing of the jury, he exercised his right not to testify.
Despite defendant's contention of lack of good-faith, the prosecutor may have, at the time of defendant's cross-examination, anticipated that Clinkscale would testify. However, because the witness subsequently chose not to testify, the prosecutor, in effect, introduced a statement by Clinkscale suggesting that he attempted to protect defendant, without that witness actually testifying or being subject to cross-examination. We note that the prosecutor did not offer Clinkscale's statement for the truth of the matter asserted, but, rather, to attack defendant's credibility by eliciting a response from defendant to show that Clinkscale could not have been telling the truth. While the statement of the non-testifying co-defendant was, itself, non-incriminating, the prosecutor linked the (presumably false) statement with evidence at defendant's trial in a manner damaging to defendant's defense. Under these circumstances, we find that it was improper for the prosecutor to introduce Clinkscale's statement, through cross-examination of defendant, and to then question defendant as to his opinion of the credibility of the co-defendant's testimony in an effort to ultimately impeach the credibility of defendant.
While we are mindful that wide latitude should be permitted during cross-examination, in the present case we conclude that the cross-examination of defendant by the prosecutor was improper and prejudicial. We further note that in none of the instances discussed above did the trial court admonish the jury to disregard any of the remarks. Even assuming we were to find that any of the prosecutor's errors, standing alone, might not have constituted reversible error, we conclude that the cumulative effect of these errors compels a reversal and remand for a new trial. See, e.g., State v. Garner (1995), 74 Ohio St.3d 49, 64
("a conviction will be reversed where the cumulative effect of errors in a trial deprives the defendant of the constitutional right to a fair trial even though each of numerous instances of trial error does not individually constitute cause for reversal"). Thus, we find that the trial court abused its discretion by failing to grant defendant's motion for a mistrial. Defendant's second and third assignments of error are sustained.
Based upon the foregoing, defendant's first assignment of error is overruled, defendant's second and third assignments of error are sustained, the judgment of the trial court is reversed and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this decision.
 _____________________ McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
PETREE and McCORMAC, JJ., concur.