UNITED STATES of America,
Plaintiff–Appellee,

v.

Brad C. BRADLEY,
Defendant–Appellant.

No. 89–1279.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1989.

Decided Jan. 4, 1990.

Opinion on Petition for Rehearing
Feb. 26, 1990.

Maxine A. White, Asst. U.S. Atty., Christian R. Larsen, Ann M. Kisting, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

William S. Mautner, Atinsky, Kahn, Sicula & Teper, Milwaukee, Wis., for defendant-appellant.

Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Melvin P. Deutsch busies himself trying to represent defendants in federal firearms cases. Last October Deutsch filed a motion for admission to the bar of this court, representing that he is a member of "Deutsch, McCormick, D'Amato & Associates" of Milwaukee, has been an attorney for 33 years, and is admitted to practice in Wisconsin, Illinois, Indiana, New York, California, Quebec, Ontario, and British Columbia. His career, as he depicts it, has soared; according to the affidavit attached to his application, "from 1985 to 1987, I did appear, before the highest court in the land eight (8) times, and I won seven (7) of the said eight (8) times, in my appearances before the Supreme Court." Perhaps out of a sense of *noblesse oblige*, Deutsch agreed to represent Brad C. Bradley, the defendant in this weapons case. Before trial, Bradley fired his lawyer and asked the district judge to approve the substitution of Deutsch, whom he described as an expert in firearms defense. The judge declined, and his refusal to allow Deutsch to represent Bradley is the lead issue presented by William S. Mautner, whom the district judge appointed in lieu of Deutsch.

■ Judge Curran churlishly looked up Deutsch in the register of Wisconsin lawyers and found his name missing. Then he looked up Deutsch in another register and found him—in the federal prison at Oxford, Wisconsin, serving time for mail fraud. That was enough for the judge but not for Mautner, who accepted Deutsch's word and never checked his credentials. We did. Deutsch is not licensed to practice in New York or anywhere else; the "law firm" in Milwaukee does not exist; he has not appeared before the Supreme Court of the United States, and during the years he said he was steamrollering his opponents he was defending himself (unsuccessfully) against criminal charges. Deutsch is a con

man, a fraud, a phony, a humbug, a mountebank—in short, an impostor. See also *United States v. Ziegenhagen*, 890 F.2d 937, 939 n. 7 (7th Cir.1989); *United States v. Bintzler*, No. 88–2508 (7th Cir. Nov. 9, 1989) (unpublished order denying Deutsch's application for admission to our bar). Indigent defendants cannot pick and choose among members of the district court's bar, *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); they certainly are not entitled to be represented by *poseurs*.

That Deutsch has no respect for the law we know (that's what landed him in prison); that *real* lawyers (Mautner is a member of the bar) should act as procurers for such as Deutsch is more surprising. Although we appreciate the difficulties under which appointed criminal defense counsel labor, their duties to their clients do not include telling tall tales without attempting to ascertain the truth. Mautner was on notice—from the district judge's opinion and from Deutsch's residence—that something was amiss. The bar as well as the bench ought to guard criminal defendants against fakers, who are unlikely to protect defendants' legal entitlements. Our order in *Bintzler* asked Wisconsin's officials to look into violations of the laws dealing with unauthorized practice; for good measure, we are sending to the United States Attorney the affidavit Deutsch filed in attempting to gain admission to our bar, which raises substantial questions under the perjury statute. Judges should be on the lookout for Mr. Deutsch, whose persistence suggests that he may have other marks in sight.

The argument that we should remand for a trial at which Deutsch would represent Bradley is only the first of twelve issues in Mautner's brief. Spreading the brief so thin ensures that none of the issues can be developed, and it has long been understood that lawyers best serve their clients' interests by concentrating on—and presenting fully—the subjects with the best chances of producing a favorable result. *Jones v. Barnes*, 463 U.S. 745, 751–53, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983). Only two of the remaining eleven issues call for comment.

Until 1984 Bradley was a registered firearms dealer. A fire at his shop in 1983 led to the discovery of a machine gun, silencers lacking serial numbers, and other weapons that private persons may not possess. Inspectors also found some "assassination kits"—modified briefcases from which concealed guns could be fired. Bradley pleaded guilty in 1984 to one count of possessing an unregistered weapon, a conviction that excluded him from his trade. Bradley went back into business anyway. In 1987 an informant (a legitimate gun dealer trying to protect the reputation of his business) bought several weapons and sets of parts from Bradley. The principal charge emerging from these purchases is that without the necessary registration Bradley transferred a collection of parts designed to turn semi-automatic weapons into machine guns (weapons capable of firing multiple shots with a single pull of the trigger), in violation of 26 U.S.C. §§ 5812, 5845(b), and 5861. Bradley's sentence was 24 months' imprisonment on the counts subject to the Sentencing Guidelines, to run concurrently with 60 months on counts not subject to the Guidelines (including the machine gun counts)—which should come out roughly the same, because parole is available on the pre-Guideline counts but not the Guideline counts.

Bradley delivered an auto sear, a selector switch, a disconnector, a trigger, and a hammer to the informant in October 1987. Two weeks later Bradley transferred a bolt carrier. These six parts will transform a semi-automatic rifle into an automatic one. The prosecution's theory is that the six parts collectively are a "machinegun" within the meaning of § 5845(b), which provides:

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of

parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

So parts may be machine guns in any of three ways: (1) any part "designed solely or exclusively ... for use in converting a weapon into a machinegun" is a statutory machine gun; (2) a "combination of parts designed and intended, for use in converting a weapon into a machinegun" is a statutory machine gun; and (3) "any combination of parts from which a machinegun can be assembled" is a statutory machine gun if one person has possession or control of all of the parts.

Bradley protests that the six parts he transferred did not fall into any of these categories. His principal argument is that the "auto sear"—an essential component of the kit—did not need to be registered because it was manufactured before 1981, when 27 C.F.R. Part 179 was amended to require all auto sears to be registered and bear serial numbers on the theory that they are themselves "combination[s] of parts designed and intended, for use in converting a weapon into a machinegun". Ruling 81–4 of the Alcohol, Tobacco, and Firearms Division of the Department of the Treasury (ATF 81–4) exercises the Secretary's power under 26 U.S.C. § 7805(b) not to apply the regulation retroactively. Because he transferred an auto sear made before November 1981, Bradley insists that he did not need to register. This argument misunderstands ATF 81–4. The ruling is not a safe harbor. It provides that auto sears made after a certain date must be registered even if transferred in isolation. The prosecution's theory in this case is not that Bradley violated the statute by transferring the auto sear; it is that the six parts together are a "combination of parts designed and intended, for use in converting a weapon into a machinegun". That Bradley could not have been convicted for an unregistered transfer of the pre–1981 auto sear by itself is neither here nor there.

An emphasis on the six parts sets up Bradley's next argument: that he did not transfer the six together, and so did not need to register. Section 5861(e) makes it a crime "to transfer a firearm in violation of the provisions of this chapter", and § 5812 requires both an application for permission to transfer, and the permission of the Secretary of the Treasury, to precede the transfer. *United States v. Mayo*, 498 F.2d 713 (D.C.Cir.1974). Both § 5812 and § 5861(e) refer to transfers of firearms; but under § 5845(b), according to Bradley, only the collection of six parts is the "firearm". An auto sear, selector switch, disconnector, trigger, and hammer (the first five parts) are incapable of turning a semi-automatic weapon such as an AR–15 into a machine gun; it takes the bolt carrier to complete the job. So, too, the bolt carrier can't produce automatic fire without the auto sear. None of the sales amounted to the transfer of a "firearm", making registration unnecessary.

■ The argument is clever but unconvincing. The statutes are designed to require notice and approval to convert rifles to machine guns. No one transfers six parts at *exactly* the same time. Even if all six come in a box, the recipient will obtain control of some parts ahead of the others. Any complex act may be decomposed into smaller acts. (The pitcher does not throw a bean ball; he toes the rubber, nods his head at the catcher, rubs the ball, winds up, accelerates his arm, releases his grip, and behold! the ball collides with the batter's noggin—none of which is forbidden by itself.) That two weeks separated the turnovers can't be dispositive. Suppose the gap were two hours, or two minutes. Bradley transferred a collection of parts sufficient to create a machine gun no *later* than the date he furnished the bolt carrier, as surely as if all six had come tied in a red ribbon.

It doesn't take much effort to imagine harder cases. The firearms laws define terms in surprising ways, causing all sorts of problems. *United States v. Anderson*, 885 F.2d 1248, 1250–51 (5th Cir.1989); *United States v. Drasen*, 845 F.2d 731 (7th Cir.1988). Defining a "machinegun" to in-

clude a bunch of parts invites efforts to transfer things at different times or from different sources. Suppose Bradley never had produced the bolt carrier, but that the customer had one of his own. Suppose Bradley had transferred the two hard-to-get parts (the auto sear and the bolt carrier) and left the customer to scrounge up others that are readily available because they have legitimate uses in repairing lawful weapons. Suppose Bradley had transferred the first five parts and sent the customer to a shop on the other side of town to get the bolt carrier. Perhaps doing so by arrangment with the other vendor would be a single transfer, but a customer who picks up a part at a time from independent proprietors does not subject any of them to a claim of forbidden transfer. All sorts of intermediate cases could be put. Fortunately for us (unfortunately for Bradley), his deeds pose no such complexities. Sequentially furnishing all six parts sufficient to convert a weapon to a machine gun is a "transfer" in gross, and the seller needs the Secretary's permission before handing over the last, critical part.

AFFIRMED