**UNITED STATES of America, Appellee,**

v.

**Melvin P. DEUTSCH, Defendant–Appellant.**

**Nos. 491, 861, Dockets 92–1174, 92–1319.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 28, 1992.

Decided Feb. 11, 1993.

---

Martin Goldberg, Franklin Square, NY, for defendant-appellant.

Mark S. Cohen, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY (Andrew J. Maloney, U.S. Atty., Emily Berger, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, MINER and McLAUGHLIN, Circuit Judges.

OAKES, Circuit Judge:

Melvin Deutsch appeals from a judgment entered on June 5, 1992, in the United States District Court for the Eastern District of New York, Jacob Mishler, *Judge.* Deutsch was convicted, following a jury trial, of committing credit card fraud in violation of 18 U.S.C. §§ 1029(a)(2) and 1029(c)(1) (1988). He was sentenced to a term of 63 months in prison and three years of supervised release. The district court fined Deutsch $60,000, imposed a $50 special assessment and ordered Deutsch to pay $34,401.33 in restitution to AT & T, the victim of the fraud.

Deutsch presents two challenges to his conviction. First, he argues that his statements at arrest should have been suppressed as federal agents had illegally entered his house without a warrant. Second, Deutsch argues that the district court erred in excluding certain trial testimony.

Deutsch also contests his sentence. He claims that the district court erred in upwardly departing from the range of 33 to 41 months provided in the federal Sentencing Guidelines to a range of 51 to 63 months. *See* U.S.S.G. § 5A Sentencing Table (Nov. 1992) ("Guidelines"). He also argues that the district court erroneously calculated the adjusted base offense level by improperly estimating the intended or probable loss caused by his fraud rather than the actual loss and by adding points for Deutsch's violation of a judicial order.

We find his arguments challenging the sentencing court's calculation of loss and upward departure to have merit and therefore remand for resentencing in light of this opinion.

## I. BACKGROUND

In October 1990, Deutsch applied for an AT & T Universal Credit Card, in his own name, using a false date of birth and social security number. AT & T issued Deutsch a card with an $8,000 credit limit. Over the next three months, approximately $34,000 was charged on the card, despite the $8,000 credit limit. In what might be called a credit-card-kiting scheme, Deutsch wrote nine checks seriatim to AT & T, all of which bounced, as he had known they would. The checks, drawn on two accounts at the Royal Bank of Canada ("RBC"), were dishonored by the RBC because Deutsch had previously closed those accounts. Due, however, to AT & T's policy of giving immediate credit upon receipt of each check, pending collection, each dishonored check maintained the active status of Deutsch's account and increased his credit line. As in all such schemes, the string ran out, and after three months, Deutsch's fraud was uncovered.

In March 1991, AT & T informed Secret Service Special Agent Alan Bergman of Melvin Deutsch's suspected fraudulent use of an AT & T credit card. The card at that time already had over $30,000 charged on it. Bergman soon discovered that the social security number provided by Deutsch on his application was not actually Deutsch's number. Bergman also learned that another AT & T card, issued under a different name, had been sent subsequently to Deutsch's address and that yet another had been ordered.

Bergman chose to deliver this last card himself. On May 15, 1991, Bergman, another special agent, and two postal inspectors drove up to Deutsch's house in a mail truck. Five large dogs, including two Great Danes, were outside the house. Hearing the truck's horn, Robert Ervin, one of Deutsch's housemates, left the house and approached the truck. Ervin signed for the package containing the third AT & T card.

Bergman then identified himself to Ervin and asked if he were Deutsch. Ervin replied that he was not. With gun drawn but pointing downwards to protect against the dogs, Bergman asked Ervin for identification. Ervin said his identification was inside and returned to the house accompanied by the agents. After a quick sweep of the house, Bergman holstered his gun. The agents noticed an office with photocopier, eight or nine telephones, law school diplomas bearing Deutsch's name, and a stack of credit card applications. The agents were told that Deutsch was in Chicago and would return at 6:00 p.m.

The agents left and returned at 6:30 p.m. without an arrest warrant. The agents wore their police identification badges outside their shirts and kept their guns holstered. In response to the doorbell, Deutsch's girlfriend, now his wife, Camilia El Didi, opened the door. The agents identified themselves and asked to speak with Deutsch. El Didi closed the door. After the agents again rang the bell, El Didi opened the door again. The agents saw Deutsch in the hallway. According to Bergman, Deutsch walked toward him and Bergman stepped inside. When informed that the visit was to investigate credit card fraud, Deutsch invited the two agents to talk in the living room.

Deutsch denied any involvement in credit card fraud. After receiving *Miranda* warnings, Deutsch told the agents he was an attorney and knew his rights. He subsequently refused to allow a search of the house after determining that the agents did not have a search warrant. The agents then drove Deutsch to the Secret Service office, giving him further *Miranda* warnings on the way and taking down information such as Deutsch's claimed social security number. Deutsch was later indicted for credit card fraud.

Deutsch moved prior to trial for suppression of statements made by himself, El Didi, Ervin and Jack Kessel, another colleague who had been present at the morning search. According to Deutsch, the agents' entry into his house had been unlawful because of their failure to obtain a warrant. All four testified that the agents had used force to enter the house in the morning and in the evening of May 15, 1991. The district court denied Deutsch's

motion to suppress the statements of El Didi, Ervin, and Kessel on the grounds that "Fourth Amendment rights are personal and can be asserted only by those whose rights are violated." The court also denied Deutsch's motion to suppress his own statements, crediting the testimony of Bergman where it contradicted Deutsch's statements. Thus, the court determined that the agents had obtained consent to enter Deutsch's house from Ervin in the morning and from Deutsch in the evening. During the hearing, Deutsch claimed he was an attorney, that he had attended law school at "McGill, York and Drake" and—not without reason—that he had "considerable experience and [was] quite knowledgeable" about United States criminal law.

At the trial, several witnesses testified as to the means employed by Deutsch to effect the fraud as well as to the extent of AT & T's loss. Agent Bergman also offered testimony about the investigation and arrest of Deutsch. El Didi was the only witness for the defense. She testified that from October 1990 to December 1990 she had lived with Deutsch and a series of sublessees or co-tenants, including Allan Berube. Berube had moved in shortly after his release from jail in October, 1990. According to El Didi, Berube gave Deutsch a credit card in Deutsch's name and told Deutsch he could use the card, since an unnamed "friend" of Berube's had offered to pay the bill. At the time of trial, Berube was again in prison, this time for violating the conditions of his parole.

Deutsch sought to call Berube, with the suggestion that doing so would prove that Berube had ordered the credit card in Deutsch's name and had committed the fraud. Deutsch wanted to treat Berube as a hostile witness, using Berube's elderly parents to impeach his testimony. Expressing concern for Berube's fifth amendment rights, the district court appointed counsel for Berube and had him testify outside the presence of the jury. Berube testified only to general background information, asserting his privilege against self-incrimination on the questions regarding the credit card fraud.

The district court denied Deutsch's motion to have Berube testify before the jury. Citing *United States v. Martin*, 526 F.2d 485, 487 (10th Cir.1975), the district court held that it was improper for Deutsch to call Berube for the sole purpose of compelling him to invoke his fifth amendment privilege in front of the jury. In addition, the district court held that the rest of Berube's testimony was irrelevant, and that, therefore, his testimony should be excluded. The jury found Deutsch guilty of credit card fraud.

The district court sentenced Deutsch on June 5, 1992. Judge Mishler added six points to the base offense level of 6 for fraud, by measuring the "intended or probable loss" as $114,000, rather than AT & T's actual loss of approximately $34,000. The district court evidently reached this figure by adding together all the checks Deutsch had written to AT & T.

Under Section 2F1.1(b)(3)(B) of the Guidelines, the court also added two points for Deutsch's violation, in the course of the fraud, of a judicial order forbidding him from holding himself out as an attorney.[1] The final adjusted offense level, which included other adjustments not challenged on appeal, was 18. At Deutsch's criminal history category of III, the guideline range was 33 to 41 months. The district court upwardly departed to offense level 22 which carries a range of 51 to 63 months in the criminal history category. The district court stated that this was a vertical departure and that the departure was based "on the defendant's long history of criminal activity, [his] unreliability, perjury and fraud" as well as on his likelihood of recidivism. The district court specifically noted that the upward departure was not based on the fact that Deutsch's criminal history category underrepresented his past conduct. The court states "I'm not basing the upward departure on the [Canadian] crimes

---

1. In November 1990, Judge Korman, the district judge before whom Deutsch had previously been convicted of conspiracy to commit wire fraud and substantive counts of wire fraud, had issued an order prohibiting Deutsch from holding himself out as an attorney.

committed. I'm using a formula for the upward departure based upon the likelihood that Mr. Deutsch will continue to commit these crimes." The district court then sentenced Deutsch to the maximum term of 63 months.

## II. DISCUSSION

Deutsch challenges both his conviction and his sentencing. We do not find merit in either of Deutsch's arguments to overturn his conviction. The district court did not err in denying Deutsch's motion to suppress his statements or in excluding Berube's testimony

■ Law enforcement agents must conform their behavior to the requirements of the Constitution and normally may not enter anyone's property without a properly executed warrant. Absent exigent circumstances (certainly not present here), "the warrantless entry of law enforcement officers into the private home of a suspect, for the purpose of making an arrest supported by probable cause, is barred by the Fourth Amendment...." *United States v. Campbell*, 581 F.2d 22, 25 (2d Cir.1978) (citations omitted).

■ If the suspect consents to the search, however, a warrantless search may be valid. *E.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The prosecution bears the burden of showing, by a preponderance of the evidence, *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981), " 'that the consent was, in fact, freely and voluntarily given.' " *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)). Voluntariness may not be established simply by a showing of acquiescence to a police officer's order to allow entry; such consent, however, need not be expressed in a particular form but "can be found from an individual's words, acts or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir.1988) (citing *Buettner–Janusch*, 646 F.2d at 764). Thus, the district court must consider the

totality of the circumstances to determine whether the consent was freely given. *United States v. Lindsey*, 877 F.2d 777, 783 (9th Cir.1989).

■ The district court determined that both Ervin in the morning and Deutsch in the evening of May 15, 1991, had given their consent to the agents' entry. After hearing all the evidence, the district court found that "[w]hen [Ervin] advised the officers that his identification was inside the house and entered for the purpose of showing them his identification, he unmistakably invited the officers inside." With respect to Deutsch, the court noted that "Deutsch was aware of his right not to permit entrance into his home without a warrant. He was also aware of his right not to answer questions. He permitted entry into his home and answered questions because he wanted to know the extent of the credit card fraud investigation." In reaching these conclusions, the district court rejected "as a fabrication" the defense witnesses' testimony that the agents had entered by force.

The district court's determinations are reasonable and will be upheld. As we have noted previously, "[r]esolution of the conflicts in testimony concerning the search of [an] apartment was essentially a question of credibility for the district judge, whose findings we will not disturb unless they are clearly erroneous." *Campbell*, 581 F.2d at 28 (citing *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976)). We do not find Judge Mishler's findings to be clearly erroneous.

■ Deutsch's second argument to overturn his conviction also lacks merit. The district court has the discretion to prevent a party from calling a witness solely to have him or her invoke the privilege against self-incrimination in front of the jury. Most of the circuits which have addressed this issue have held it not to be error for a district court to bar such a witness from testifying. *See United States v. George*, 778 F.2d 556, 562–36 (10th Cir.1985); *United States v. Vandetti*,

623 F.2d 1144, 1147–49 (6th Cir.1980); *United States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978); *Royal v. Maryland,* 529 F.2d 1280, 1281 (4th Cir.1976) (per curiam); *United States v. Harris,* 542 F.2d 1283, 1298 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *United States v. Lacouture,* 495 F.2d 1237, 1240 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *United States v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973); *Bowles v. United States,* 439 F.2d 536, 541–42 (D.C.Cir.1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971). *See also United States v. Marquez,* 319 F.Supp. 1016, 1020–23 (S.D.N.Y.1970), *aff'd,* 449 F.2d 89 (2d Cir.1971), *cert. denied,* 405 U.S. 963, 92 S.Ct. 1173, 31 L.Ed.2d 239 (1972); *People v. Thomas,* 51 N.Y.2d 466, 472–73, 434 N.Y.S.2d 941, 944–45, 415 N.E.2d 931, 934 (1980).

> As the Supreme Court has stated, "If the privilege claimed by the witness be allowed, the matter is at an end. The claim of privilege and its allowance is properly no part of the evidence submitted to the jury, and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right. The allowance of the privilege would be a mockery of justice, if either party is to be affected injuriously by it."

*Johnson v. United States,* 318 U.S. 189, 196–97, 63 S.Ct. 549, 553, 87 L.Ed. 704 (1943) (quoting *Phelin v. Kenderdine,* 20 Pa. 354, 363 (1853)). Although neither party may properly draw such inferences, "it is feared that its assertion in the presence of the jury may have a disproportionate effect on its deliberations." *Vandetti,* 623 F.2d at 1148 (citing *Bowles,* 439 F.2d at 541). Moreover, the probative value of this evidence is lessened by the inability of the other party to cross-examine. *Vandetti,* 623 F.2d at 1148. The district court, in its discretion, must weigh the relevant factors in determining whether to exclude the witness and "determine whether the probative value of the proffered evidence is substan-

tially outweighed by the danger of unfair prejudice." *Id.* at 1149 (citing Fed.R.Evid. 403). " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note. We note, however, that this danger is not so great when the defense rather than the Government seeks to draw inferences from a witness's silence. This difference must be borne in mind when determining the proper balance under Rule 403.

■ The district court in this case heard Berube's testimony outside of the presence of the jury. After determining that Berube's testimony would consist only of irrelevant information and the invocation of his privilege against self-incrimination, the district court did not permit Deutsch to call him. After viewing the transcript of Berube's testimony taken outside the presence of the jury, we do not find an abuse of discretion in its exclusion. Moreover, in light of the overwhelming evidence against Deutsch, the district court's determination, if in error, would constitute harmless error. It is, we believe, extremely unlikely that Berube's appearance on the stand would have altered the jury's verdict—especially given the farfetched story about a "friend" of Berube's supposedly being willing to pay Deutsch's credit card bill. *See Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (discussing harmless error rule).

Deutsch also argues that, even if his conviction is not overturned, his sentence should be reconsidered on three grounds: that the district court erroneously calculated his adjusted base offense level by adding points for violation of a judicial order and for an intended or probable loss of $114,000 and that the district court made procedural errors in its upward departure.

■ We give due deference to the district court's application of the Guidelines to the facts, 18 U.S.C. § 3742(e) (1988); *United States v. Pimentel,* 932 F.2d 1029, 1031 (2d Cir.1991). We review the legal interpretations *de novo* and factual determina-

tions for clear error. *Id.* at 1031–32; *see United States v. Santiago,* 906 F.2d 867, 871 (2d Cir.1990) (court "will not overturn the [district] court's application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion"). In addition, "disputed sentencing factors need only be proved by a preponderance of the evidence." *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 182 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). *But see United States v. Concepcion,* 983 F.2d 369, 394–96 (2d Cir.1992) (Newman, J., concurring) (suggesting that a higher standard might be preferable).

■ Section 2F1.1 of the Guidelines, governing fraud and deceit, provides a base offense level of six, to be increased for various specific offense characteristics listed in Section 2F1.1(b). The district court made a two-point upward adjustment for violation of a judicial order and a six-point upward adjustment based on the amount of intended or probable loss.

The Guidelines allow an adjustment in the base offense level if "the offense involved ... violation of any judicial or administrative order...." U.S.S.G. § 2F1.1(b)(3)(B). The district court's finding that Deutsch had held himself out as an attorney in violation of a judicial order is supported by abundant evidence. Although there was no direct evidence that Deutsch had stated he was an attorney on his credit card application,[2] overwhelming circumstantial evidence supported the district court's finding that Deutsch had represented himself as an attorney in connection with this offense. For example, Agent Bergman testified that, at the time of arrest, Deutsch called himself an attorney. Moreover, during the course of the fraud, Deutsch had used his AT & T card to pay $270 in fees to the New York State Bar Association. At the suppression hearing, Deutsch told Judge Mishler to his face that he was an attorney, had attended law school at "McGill, York and Drake" and had "considerable experience and [was]

quite knowledgeable" about criminal law. Deutsch's record in this area is legendary. *See United States v. Deutsch,* 981 F.2d 299 (7th Cir.1992) (Deutsch appearing as "attorney" for himself); *United States v. Bintzler,* No. 88–2508, 1990 WL 100768, at *1 n. 2, 1990 U.S.App. LEXIS 12075, at *3 n. 2 (7th Cir. July 11, 1990) ("Mr. Deutsch is not an attorney."); *Phillips v. Brennan,* 912 F.2d 189, 191 n. 2 (7th Cir.1990) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993); *United States v. Bradley,* 896 F.2d 284, 286 (7th Cir.) ("P.T. Barnum would have been proud."), *cert. denied,* 495 U.S. 909, 110 S.Ct. 1935, 109 L.Ed.2d 298 (1990); *United States v. Bradley,* 892 F.2d 634, 634–35 (7th Cir.1990) ("Deutsch is a con man, a fraud, a phony, a humbug, a mountebank—in short, an impostor [sic]."); *United States v. Ziegenhagen,* 890 F.2d 937, 939 n. 7 (7th Cir.1989) (Deutsch "is not currently and never has been a licensed attorney"); *United States v. Novak,* CR–88–0329, 1990 WL 209831, at *1, 1990 U.S.Dist. LEXIS 17287, at *1 (E.D.N.Y. Dec. 12, 1990) ("Deutsch has never been admitted to the Bar of this state. That formality has not prevented him from holding himself out as a lawyer in this and other states."); *Deutsch v. Federal Defender Program,* No. 90 C 2072, 1990 WL 171764, at *1 n. 1, 1990 U.S.Dist.LEXIS 14448, at *1 n. 1 (N.D.Ill. Oct. 29, 1990) ("We believe it is well-settled that Deutsch is not a licensed attorney in Illinois or elsewhere."); *United States v. Tyler,* 745 F.Supp. 423, 426 (W.D.Mich. 1990) ("Mr. Deutsch held himself out as an attorney to Mr. Tyler and others....").

It bears noting that, as recently as one month ago, the Seventh Circuit issued an opinion which reveals that it has been taken in by Deutsch—much as Lady Tichborne was taken in by the claimant—despite his previous notorious appearances in that court. Apparently, Deutsch served as his own "attorney" and successfully represented to the Seventh Circuit panel that he works as a partner in the firm of Deutsch, McCormick, D'Amato & Associates, the

---

**2.** AT & T's practice was to destroy the employment file of its application record periodically.

Thus, Deutsch's file did not show which profession he had listed on his application.

panel failing to take note of his spurious legal credentials. *See Deutsch*, 1990 WL 171764, at *1, 1992 U.S.App. LEXIS 32251, at *1. In light of the above, we find the district court's determination to be reasonable, indeed perhaps compelled.

■ Unlike Deutsch's other claims, his two final claims have merit. First, he challenges the district court's determination of the amount of AT & T's loss. Section 2F1.1 of the Guidelines calls for an adjustment to the base offense level depending on the amount of the loss. Judge Mishler increased Deutsch's base offense level by 6 after determining that the amount of the intended loss equaled $114,000. He reached this figure by adding together all of the bogus checks Deutsch had sent to AT & T. But this figure misstates the nature of the scheme. Deutsch's scheme was designed to increase his credit limit by replacing a dishonored check with another check for a greater amount, as in check-kiting. Each check, in effect, replaced all the previous checks and was not cumulative. As defense counsel noted, it would have taken Deutsch 39 months to defraud AT & T of $120,000 using this method. In fact, Deutsch ultimately defrauded AT & T only of approximately $34,000.

Application Note 7 to Section 2F1.1 states that, "[c]onsistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." Application Note 8 to Section 2F1.1 states that "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." The district court's calculation, however, bears no relation to the "probable or intended loss." U.S.S.G. § 2F1.1, Application Note 7 (1990); *see United States v. Lohan*, 945 F.2d 1214, 1219 (2d Cir.1991). By adding together all of the checks written by Deutsch, the district court did not approximate the amount Deutsch intended to swindle but engaged in pure speculation. Such speculation is not permissible under the Guidelines.

We also find merit in Deutsch's argument that the district court's upward departure was procedurally defective. Deutsch argues that the district court failed to specify which section of the Guidelines it relied upon for its upward departure and requests clarification and re-sentencing on that ground.

■ Two separate provisions allow a sentencing court to depart from the sentence mandated by the Guidelines. First, a court may depart upwardly from the Guidelines range where it finds that "there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1988 & Supp.1992); U.S.S.G. § 5K2.0. Such departures are reviewed for reasonableness. *U.S. v. Campbell*, 967 F.2d 20, 26 (2d Cir.1992). In assessing the reasonableness of the district court's departure, the reviewing court "should look 'to the amount and extent of the departure in light of the grounds for departing' and 'examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence.'" *Id.* (quoting *Williams v. United States*, — U.S. —, —, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992)).

■ Second, a district court may depart under Section 4A1.3, if the criminal history category does not "adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. Congress mandated specific procedures to be used in making a departure under this section.

Unlike departures pursuant to section 5K2.0, which the Commission left unguided, departures under section 4A1.3 are more cabined. When a court wishes to depart on the basis of an inadequate criminal history category, it is instructed to use 'as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable.'

Bruce M. Selya & Matthew R. Kipp, *An Examination of Emerging Departure Jurisprudence Under the Federal Sentencing Guidelines*, 67 Notre Dame L.Rev. 1, 37–38 (1991) (quoting U.S.S.G. § 4A1.3). Thus, this Circuit requires a step-by-step procedure for horizontal departures under Section 4A1.3, but not for vertical ones under Section 5K2.0. *Campbell*, 967 F.2d at 25–27 (citing *United States v. Coe*, 891 F.2d 405, 413 (2d Cir.1989) (horizontal departure under U.S.S.G. § 4A1.3), and *United States v. Kim*, 896 F.2d 678 (2d Cir. 1990) (vertical departure under U.S.S.G. § 5K2.0)).[3]

> A precise procedure regulates the exercise of discretion in making [a 4A1.3] departure. In keeping with the mandate of rationalizing the sentencing process, the Guidelines require a judge to 1) determine which category best encompasses the defendant's prior history, and 2) use the corresponding sentencing range for that category "to guide its departure."

*United States v. Cervantes*, 878 F.2d 50, 53 (2d Cir.1989) (quoting U.S.S.G. § 4A1.3).

■ In this case, the district court failed to state the section number upon which it relied to make its upward departure. Although such an omission may be inconsequential if the basis for the departure is obvious in context, the district court's error here was more serious. The district court gave every indication that it was making a 5K2.0 departure, including mentioning numerous times that it was making a vertical and not a horizontal departure. Nonetheless, the district court based its departure on Deutsch's criminal record and likelihood of recidivism. The court stated that "the reason for my upward departure is [that] your past criminal conduct, your perjury and lying *indicate to me* that there is a very strong likelihood that you will commit crimes of fraud, forgery, perjury and like crimes." These factors are exactly those to be considered under Section 4A1.3.[4] The strictures of 4A1.3 may not be avoided by classifying a departure based on criminal history as one involving aggravating circumstances under 5K2.0. We note that at least one other court has determined that past criminal conduct and likelihood of recidivism can be the basis for either a 4A1.3 or a 5K2.0 departure.[5] We disagree. To allow a district court to classify past criminal conduct and likelihood of recidivism as aggravating circumstances would circumvent the procedures established by Congress to evaluate these very factors.

In light of this discussion, we note that the district court, despite its statements to the contrary, made a 4A1.3 departure but failed to use the required step-by-step procedure in determining a new criminal history. Failure to articulate the reasons underlying a 4A1.3 departure "renders the sentence unlawful." *Cervantes*, 878 F.2d at

---

3. In *Kim*, we stated that "when an offense level is deemed inadequate and a judge is contemplating a 5K departure by moving vertically down the sentencing table to a more serious level, the judge should consider the next higher levels in sequence to determine if they adequately reflect the seriousness of the defendant's conduct." *Kim*, 896 F.2d at 685. We have since clarified that this procedure is not required for 5K departures but merely encouraged. *See Campbell*, 967 F.2d at 25.

4. "If reliable information indicates that the calculus 'does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes,' the court may depart from the Guidelines." *Cervantes*, 878 F.2d at 53 (quoting U.S.S.G. § 4A1.3).

5. In *United States v. Montenegro–Rojo*, 908 F.2d 425 (9th Cir.1990), the Ninth Circuit noted the reason for allowing departures under 4A1.3: " 'The recidivist's relapse into the same criminal behavior demonstrates his lack of recognition of the gravity of his original wrong, entails greater culpability for the offense with which he is currently charged, and suggests an increased likelihood that the offense will be repeated yet again.' " *Id.* at 429–30 (quoting *United States v. De Luna–Trujillo*, 868 F.2d 122, 125 (5th Cir. 1989). The Ninth Circuit stated in a footnote that this behavior would permit a departure under 5K2 as well: "the very fact that the defendant continued to act in a way previously adjudicated to be wrongful somehow makes him more blameworthy the second time around. Moreover, it suggests that the defendant is likely to engage in illegal conduct yet again, which would justify departure based on endangerment of public safety." *Id.* at 430 n. 6.

54 (citing 18 U.S.C. § 3742(d)(1) (Supp. V 1987)).

### III. CONCLUSION

We affirm Deutsch's conviction but remand for sentencing in conformity with this opinion.