UNITED STATES of America

v.

Steven Allen SCHWARTZ

No. CRIM. A. 03–35–1.

United States District Court,
E.D. Pennsylvania.

July 26, 2005.

Steven Allen Schwartz, Philadelphia, PA, pro se.

Mark E. Cedrone, Cedrone & Janove, Philadelphia, PA, for Steven Allen Schwartz.

Wendy A. Kelly, United States Attorney's Office, Philadelphia, PA, for United States of America.

*MEMORANDUM*

DALZELL, District Judge.

■ The "real conduct" in this case requires a detailed explanation of our application of *United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) to the extraordinary record here. That is to say, faithful to the teaching of Justice Breyer's majority opinion in *Booker*, we carefully consult the Sentencing Guidelines "and take them into account," *id.* at 767, but we do so "while maintaining a strong connection between the sentence imposed and the offender's real conduct—a connection important to the increased uniformity of sentencing that Congress intended its guidelines system to achieve." *Id.* at 757.

As will be seen, Steven Schwartz's "real conduct" here reveals the grave "seriousness of the offense" and the powerful need "to protect the public from further crimes of [this] defendant" that *Booker's* gloss on 18 U.S.C. § 3553(a)(2)(A) and (C), directs us to consider. Having presided over fifteen days of trial and as many days for pretrial matters, we are intimately familiar with "the history and characteristics of the defendant", 18 U.S.C. § 3553(a)(1). We also have had the luxury of long reflection on this large record to calibrate our *Booker* calculus.

We also write at some length because we take a leaf from the opinion of Judge Easterbrook in *United States v. Bradley,* 892 F.2d 634 (7th Cir.1990). In that case, Judge Easterbrook, for himself and Judges Posner and Coffey, dealt with a *poseur,* Melvin P. Deutsch, who falsely held himself out as a criminal defense lawyer, but who was, in Judge Easterbrook's words, "a con man, a fraud, a phony, a humbug, a mountebank—in short, an imposter." *Id.* at 634–35. Judge Easterbrook and his colleagues gave this workout to their thesaurus because they believed that "[j]udges should be on the look-out for Mr. Deutsch, whose persistence suggests that he may have other marks in sight." *Id.* at 635. As Schwartz gives us precisely such a concern for judges, the general public, and even the Bureau of Prisons, we follow the Seventh Circuit's example here.

The result of our detailed canvass of the record will also moot the motion for upward departure that the Government filed two weeks ago.

*Schwartz's Criminal History and the Offense Conduct*

Steven Schwartz is no stranger to fraud prosecutions in this court. Because this history powerfully bears upon the Sentencing Reform Act factors that *Booker* requires us to weigh, we set it out at some length.

In 1989, a jury convicted Schwartz of two counts of bank fraud against Philadelphia National Bank in a trial before Judge Katz. The Court of Appeals affirmed those convictions in an opinion by Judge Greenberg, for himself and Judges Scirica and Seitz, *United States v. Schwartz,* 899 F.2d 243 (3d Cir.1990), *cert. denied* 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990) (we refer to this first prosecution as *"Schwartz I"*). As he did here, Schwartz testified at the trial in *Schwartz I* and claimed that one check was not kited because of the good faith belief that someone else would cover it, and the second check Schwartz claimed he did not repay "on advice of counsel because he had offsetting claims against the bank." *Id.* at 245. Judge Greenberg responded to such contentions by stating, "[i]n the circumstances of this case, if Schwartz did not depart from fundamental honesty, moral uprightness, fair play and candid dealings, then it is difficult to understand what conduct would constitute such a departure." *Id.* at 247.

After his conviction in *Schwartz I* was affirmed, Schwartz served the eighteen month custodial sentence Judge Katz imposed.[1] Upon his release from custody, however, it soon became necessary for Judge Katz to convene a violation hearing, which he did on May 17, 1994. Judge Katz

---

1. Specifically, Judge Katz sentenced Schwartz on count two to probation for five years and restitution to Philadelphia National Bank of $94,085.25, and on count three to a custodial term of eighteen months. The Court of Appeals remanded for the limited purpose of recalculating the restitution to deduct the $30,000 check as to which Schwartz was acquitted in count one. *Schwartz,* 899 F.2d at 248 (*pace United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997)).

that day filed findings of fact and conclusions of law that, *inter alia,* held that it was "apparent that the defendant is continuing the same pattern of behavior which lead to his conviction for bank fraud in this case." *U.S. v. Schwartz,* 851 F.Supp. 692, 695 (E.D.Pa.1994), *aff'd* 46 F.3d 1120 (3d Cir.1994) (table), *cert denied* 514 U.S. 1076, 115 S.Ct. 1722, 131 L.Ed.2d 580 (1995). Judge Katz remanded Schwartz to the custody of the Attorney General for another six months.

Thereupon, Schwartz began a fusillade of filings with Judge Katz,[2] including a § 2255 claim that he had "irrefutable evidence that he was the victim of a massive fraud" by Philadelphia National Bank. *See* Crim. No. 88–215, docket no. 201. Ultimately, Schwartz expanded the web to include subpoenas on a number of judges, including Judge Greenberg of the Court of Appeals.[3] On October 30, 1995, Judge Katz quashed the subpoenas on Judge Greenberg and the other judges "because they are frivolous, designed for purposes of harassment, and have no bearing on the issue at hand." *U.S. v. Schwartz,* 903 F.Supp. 852, 857–58 (E.D.Pa.1995). On the same day, after a hearing, Judge Katz held that Schwartz's disorderly conduct, submission of a false tax return to his probation officer, and failure to file timely tax returns constituted a probation violation. Judge Katz again revoked Schwartz's probation and remanded him to the custody of the Attorney General for another year. *Id.* at 858.[4]

It is apparent from the record in our case that, not long after *Schwartz I* was finally over, Schwartz was very much back in the business of defrauding people, albeit on a much more elaborate scale than in the *Schwartz I* prosecution. Thus, in January of 2003, Schwartz was indicted on twenty-seven counts of federal crimes (*"Schwartz II"*). Specifically, he was charged with wire fraud under 18 U.S.C. § 1343, bank fraud under 18 U.S.C. § 1344, identity theft in violation of 18 U.S.C. § 1028(a)(7), use of fictitious names for mailing under 18 U.S.C. § 1342, and conspiracy to commit wire fraud, bank fraud and identity theft under 18 U.S.C. § 371.

On April 22, 2005, a jury convicted Schwartz of conspiracy to commit wire and bank fraud and identity theft; it also found him guilty of five counts of wire fraud, nine counts of bank fraud, and one count of use of a fictitious name for mailing. We had granted Schwartz's Rule 29 motion on seven counts at the close of the Government's case. The jury acquitted him of one count of identity theft and one count of use of

**2.** One might have thought *Schwartz I* would, for all practical purposes, have terminated with the Court of Appeals's affirmance in the spring of 1990. The docket sheet reveals that the certified copy of that affirmance was docket paper no. 82 (Apr. 27, 1990). The last docket entry was made on January 31, 1996; it was docket paper no. 300.

**3.** Indeed, Schwartz on November 30, 1994 had filed a civil action that named Judges Katz, Shapiro, J.M. Kelly, Reed and Pollak as among the defendants. Pursuant to 28 U.S.C. § 292(b), then-Chief Judge Sloviter appointed Judge Conaboy, of the Western District of Pennsylvania, to preside over the case. Judge Conaboy dismissed the action, which had to do with Schwartz's sentencing and "various actions of several federal defendants stemming from Mr. Schwartz's criminal trial and continuing to the present day." *Schwartz v. Kunz,* 1996 U.S. Dist. LEXIS 3741 (E.D.Pa. Mar. 22, 1996). Judge Jordan, of the District of Delaware, in 2003 dismissed another action Schwartz filed against the Clerk of this Court and certain U.S. Probation Officers, Assistant United States Attorneys, and others. *Schwartz v. Kunz,* 2003 U.S. Dist. LEXIS 7716 (E.D.Pa. Apr. 4, 2003).

**4.** The Court of Appeals three months later reversed the revocation and directed Schwartz's release because the time for probation had expired. *See U.S. v. Schwartz,* No. 95–1941 (3d Cir. Jan. 31, 1996).

fictitious name for mailing, but the jury could not reach a verdict as to one count of wire fraud and one of use of fictitious name for mailing. The Government later advised us that it elected not to retry Schwartz as to the counts where the jury was unable to reach a verdict.

The trial testimony, which lasted well over two weeks, revealed that Schwartz had defrauded at least fourteen victims—all natural persons—out of a minimum of $1,183,000 between 1997 and 2002. With some victims, most dramatically in the instance of Alex and Kathrina Warren, they lost their life savings with Schwartz, who claimed to be "the trader Wall Street fears most." Indeed, Mrs. Warren, now separated from her husband, is homeless. But the "amount of loss", even in total, does not begin to capture the harm Schwartz inflicted not only on victims who lost money, but on those who lost none.

A review of the record regarding Peggy Sue Dorsey, Schwartz's erstwhile fiancée, provides a vivid example of such non-monetary harm. In her lengthy testimony, Ms. Dorsey reported that in 1999 Schwartz suggested to her that he could pay off his $60,000 debt to her if he could use her Charles Schwab account to engage in options trading.[5] Ms. Dorsey, anxious to get her money back, agreed. Schwartz soon saw significant gains from his options trading, so much so that in September of 1999 Ms. Dorsey became concerned about her large tax liability since all of the trading was being done in an account bearing only her Social Security number. After consulting with counsel and a certified public accountant, she liquidated the account, paid her accumulated liability to the Internal Revenue Service, and withheld at least part of what was due her; she remitted the balance to Schwartz.

Because Ms. Dorsey had committed the cardinal sins of (a) getting her money back and (b) engaging in self-help to do it, Schwartz, in her words, "began a campaign against me".[6] The jury heard, for example, grotesque and lengthy voicemail tirades Schwartz left for Ms. Dorsey at her place of work. Schwartz also tormented her family and others. We heard appalling voicemail harangues that Schwartz left with her father, William H. Dorsey, a man of advanced years, on Mr. Dorsey's home phone in Texas. Not content to carry on this barrage of invective against Ms. Dorsey and her father, Schwartz filed a disciplinary complaint in the state of Texas against Lawrence Brown, Esquire, the attorney who referred Ms. Dorsey to the certified public accountant to calculate her tax liability resulting from Schwartz's trading in her name. Although the Texas disciplinary authorities dismissed Schwartz's complaint, to this day Mr. Brown remains a codefendant with Ms. Dorsey in civil proceedings Schwartz instituted in Tarrant County, Texas, where Schwartz has sued Mr. Brown for $13 million.[7]

---

5. Suffice it to say that Schwartz was convinced he could not open brokerage accounts in his own name.

6. Ms. Dorsey put the matter even more pungently in her victim letter to the Court of July 19, 2005:

   I lost my job at that time and I attribute that loss to Mr. Schwartz. I also lost friends and acquaintances because of his contact with them. When combined with the use of my financial data, Mr. Schwartz in essence stole my life.

Ltr. from Peggy Dorsey to Hon. Stewart Dalzell, Jul. 19, 2005, p. 2.

7. That action, *Steven Schwartz v. Peggy Sue Dorsey*, No. 348–194605–02, 348th Judicial District of Tarrant County, Texas (the "Tarrant County suit"), was an obvious vehicle for Schwartz to harass and intimidate the Government's star witness, Ms. Dorsey. Astoundingly, Schwartz, who represented himself, persuaded the state court judge to press on to trial even though the Government had moved that court to stay proceedings pending the

Not content to do everything possible to make Mr. Brown's life miserable, Schwartz even drew into this kabuki the receptionist in Mr. Brown's office, Ms. Sally Montoya, who also testified at trial. On August 23, 2002, Schwartz faxed a letter to Ms. Montoya, received in evidence as Government's Exhibit 104 (Bates No. 09044), which bears quotation in full:

Dear Ms. Montaya [*sic*]:

I write to confirm our telephone conversation that took place at approximately 2:25 p.m. (e.t.) today. You advised me that you were in your office when I arrived yesterday at 4:00 p.m. (c.t.).

As you were in your office, you overheard the threats of violence that Mr. Brown made. You also witnessed the physically threatening and offensive environment that Mr. Brown created. It is a very small office. The doors were open. Mr. Brown made his threats against me in an open area of the offices. He threw the motion papers I served him at me as he was threatening me.

You advised me that you were in position to witness this, but you did not hear what was said. You only heard voices. That is an impossibility. Mr. Brown's physical confrontation was done in the open. His voice was raised and his threats were clear. I was always backing away as Mr. Brown continued to attempt to physically threaten me.

The conduct that you witnessed was a violation of Mr. Brown's responsibilities and obligations as a member of the Bar of the state of Texas and was a violation of the law. If a police officer were present yesterday, Mr. Brown would have been taken into custody.

/s/

Steven Schwartz

According to Ms. Montoya and Mr. Brown, the only thing true in this letter was that Schwartz in fact arrived in person at Mr. Brown's office on August 22, 2002. *Every other representation of fact was a fabrication.*

We quote Government's Exhibit 104 in full because it represents a perfect exemplar of Schwartz's "real conduct." That is to say, the record here is replete with instances like Government's Exhibit 104 where Schwartz constructed an elaborate alternate reality to suit his needs. It did not matter to him whether the (involuntary) players in these dramas were his closest friends. For example, David Rabin, a friend since childhood, had the misfortune of entrusting $10,000 with Schwartz. When Mr. Rabin repeatedly asked for his money back, Schwartz ultimately imposed the *quid pro quo* of Defendant's Exhibit 10, a so-called "general release" which contained detailed representations of fact which Mr. Rabin testified were "all wrong," but which he nevertheless signed "to get it over with". Importantly, Schwartz not only used the "release" to create yet another alternate reality, he also used it to administer what we shall call the Schwartz Treatment to try to trick our jury.[8]

conclusion of this prosecution. After a hearing on May 16, 2003 at which it became pellucid that Schwartz was using the Tarrant County suit to intimidate Ms. Dorsey and make an end run around the discovery protections of the Federal Rules of Criminal Procedure, we invoked our authority under 28 U.S.C. § 1651 and stayed the Tarrant County suit. *See* docket no. 25.

**8.** To take a perhaps cruder example, Schwartz, echoing his testimony in *Schwartz I*, told the jury in *Schwartz II* that his checks bounced because a "partner" with interests "in Alaska" failed to wire funds that Schwartz expected. Schwartz did not say whether this unnamed "partner" from the North wore a red suit.

It bears noting that Schwartz elected to represent himself at trial.

The extensive trial record of Schwartz's large scale fraud that was adduced before us was not the end of this saga. While *Schwartz II* was pending against him, Schwartz committed nine more crimes that a jury convicted him of in a trial before Judge Bartle in November of 2004. *See United States v. Schwartz*, Crim. No. 04–231 (E.D.Pa.) (*"Schwartz III"*).[9] Thus, even the pendency of this vigorously prosecuted case and the discipline of release conditions did not deter Schwartz from committing further frauds.

*The Sentence and the Government's Upward Departure Motion*

It should be readily apparent by now that the amount of loss in this case—that is to say, the engine that largely drives the Guidelines calculus under U.S.S.G. § 2B1.1—does not, even with other Guidelines' enhancements, adequately "reflect the seriousness of the offense," 18 U.S.C. § 3553(a)(2)(A), when measured against Schwartz's "real conduct." Fortunately, we have found a guide that helps us arrive at "just punishment" and is far more realistic than the bean counting of U.S.S.G. § 2B1.1.

The essence of these offenses—from the prosecutions from *Schwartz I* through *Schwartz III* and especially before us— was, after all, Schwartz's constant use of falsehoods. As noted, he applied the Schwartz Treatment in many ways, from faxes to a receptionist, to a "general release" to a childhood friend, to interminably boorish and belligerent telephone communications, to overbearing voicemail tirades, to the Tarrant County suit and to his testimony to the jury here and before two other judges and juries in this courthouse.

Of course, the Western tradition has since ancient times set its face against lying. The Book of Exodus demands, in the King James translation, "thou shalt not bear false witness." Exod. 20:16.[10] But the question of the nature of lying is one that has occupied Western thought since Moses first brought down the tablets from Mt. Sinai. Careful consideration of that question will aid our *Booker* inquiry.

St. Augustine's *De mendacio, Lying*, which he wrote in 395 A.D., remains a classic text. *See* St. Augustine, *Lying*, in 16 *The Fathers of the Church* (Mary Sarah Muldowney trans., 1952). In that treatise, St. Augustine noted that there are eight types of lies, ranging from what we would call the white lie—*i.e.*, "that which is harmful to no one and beneficial to some person, with the exception of the case where a judge is questioning," *id.* at 87— to what might be regarded as a pure lie, told by a liar who "loves to lie and passes his time in the joy of lying." *Id.* at 79. We shall refer to this latter type as "the Augustinian liar."

Drawing on St. Augustine's analysis and definitions, Professor Harry G. Frankfurt has recently noted that "[i]t is impossible for someone to lie unless he thinks he knows the truth." Harry G. Frankfurt, *On Bullshit* 55 (2005).[11] As Professor

---

**9.** Specifically, Schwartz was convicted of two counts of bank fraud and seven of wire fraud. On May 18, 2005, having found an amount of intended loss of almost $17,000 on these counts, Judge Bartle imposed a custodial sentence of eighteen months to be followed by five years' supervised release and a fine of $2,500.

**10.** The Contemporary English version (1995) translates the verse more inclusively as "Do not tell lies about others."

**11.** According to the *New York Times*, Professor Frankfurt's book has an interesting provenance.

Now 76, Harry G. Frankfurt "is a moral philosopher of international reputation and a professor emeritus at Princeton." Peter Edidin, "Between Truth and Lies, An Unprintable Ubiquity." *N.Y. Times*, Feb. 14, 2005, at E1. While teaching at Yale in 1986, he authored the essay discussed in the text because "I had always been convinced about the importance

Frankfurt persuasively notes:

Someone who lies and someone who tells the truth are playing on opposite sides, so to speak, in the same game. Each responds to the facts as he understands them, although the response of the one is guided by the authority of the truth, while the response of the other defies that authority and refuses to meet its demands.

*Id.* at 60–61. By contrast, Professor Frankfurt describes the distinction between the Augustinian liar and the bullshitter:

When an honest man speaks, he says only what he believes to be true; and for the liar, it is correspondingly indispensable that he considers his statements to be false. For the bullshitter, however, all these bets are off: he is neither on the side of the true nor on the side of the false. His eye is not on the facts at all, as the eyes of the honest man and of the liar are, except insofar as they may be pertinent to his interest in getting away with what he says. He does not care whether the things he says describe reality correctly. He just picks them out, or makes them up, to suit his purpose.

*Id.* at 56.

In considering the meanings of *bull* and *bullshit* provided in the *Oxford English Dictionary*, Professor Frankfurt notes that the *OED* cites a usage exemplar from Eric Ambler's novel, *Dirty Story*, which suggests, with the *OED*'s apparent approval, that *bullshit* is preferable in polite company to a *lie*. As Ambler put it in the mouth of a character, "Never tell a lie when you can bullshit your way through." *See* Eric Ambler, *Dirty Story* 25 (1967), quoted at II *Oxford English Dictionary* 645, def. 2 (2d ed.1989) and in Frankfurt at 48. Disagreeing with Ambler, and most pertinently to Schwartz's case, Professor Frankfurt concludes by observing that the bullshitter

does not reject the authority of the truth, as the liar does, and oppose himself to it. He pays no attention to it at all. By virtue of this, bullshit is a greater enemy of the truth than lies are.

*Id.* at 61.

From what he said before Judge Katz in *Schwartz I* (and its aftermath) through the records in our case and, indeed, in his trial testimony before us in April, Schwartz constantly aligned himself with Professor Frankfurt's paradigmatic bullshitter: "He does not care whether the things he says describe reality correctly. He just picks them out, or makes them up, to suit his purpose." *Id.* at 56. This describes Schwartz, the "greater enemy of the truth," to a *t*.

Quite literally, no one—investor, lawyer, receptionist, childhood friend,[12] fiancée, judge, or jury—should trust *anything* this man says. Anyone who deals with Schwartz, or even comes near him (as in

---

of truth" and "the lack of concern for truth and respect for truth that [bullshit] represented." *Id.* After the seminar, "the essay tended to be passed along, samizdat style, from one aficionado to another" before a Princeton University Press editor persuaded Professor Frankfurt "about publishing the essay as a stand-alone volume." *Id.*

On the theory that readers of judicial opinions are all grown-ups, we choose not to be squeamish about the book's title or subject—

unlike the *Times*, which found the word "unfit to print." *Id.*

12. It bears noting that Mr. Rabin was not the only such victim. Schwartz was convicted of Count 23, which charged him with the fictitious use of Robert Schlachter's name for mailing. Mr. Schlachter, besides being Schwartz's "friend" since 3rd or 4th grade, was also his college roommate for two years. Schwartz also squandered at least $8,500 of Mr. Schlachter's money.

the cases of Mr. Brown and Ms. Montoya), does so at high peril.

Worse, the record shows that Schwartz is utterly incorrigible. Proof that he is undeterrable may be seen in the crimes he committed while under the supervision of this very court that led to his convictions before Judge Bartle last November. Further proof will be found in Schwartz's cognate testimony before us and Judge Katz, and in his "continuing the same pattern of behavior" while on probation after his release in *Schwartz I. See supra* 851 F.Supp. at 695. Given Schwartz's ironclad incorrigibility, unleavened by an iota of remorse, there is an extraordinary need "to protect the public from further crimes of [this] defendant," 18 U.S.C. § 3553(a)(2)(C).

▆ After our careful consultation and taking account of the Guidelines' discipline, we conclude that "just punishment" given the "real conduct" here, *Booker, supra,* demands a sentence in excess of the 151 to 188 month Guidelines range. We therefore will impose a sentence of 225 months, to be served consecutive to defendant's sentence in *Schwartz III.* This sentence assures that, even if Schwartz earns credit for good conduct in prison, he will not be released from full custody until a time when most people have left their life's work for the cooler groves of retirement.[13]

As noted earlier, the Government filed a motion for upward departure from the Guidelines, pursuant to U.S.S.G. §§ 5K2.0 and 5K2.3. Much of the Government's motion is predicated on the non-monetary factors we have just painstakingly rehearsed. Of course, given the sentencing regime *Booker* has ordained, the Govern-

ment's motion constitutes something of a square peg for a round hole. Indeed, the Government acknowledges as much in its motion when it writes that, "although the Guidelines are now advisory and not mandatory, the government makes this motion to make a record of the facts and circumstances which it believes are not adequately taken into account by the Guidelines in the case of this particular defendant." Gov't Mot. at 5.

Our Memorandum here is, among other things, testament to our agreement with the Government that, at least under the old regime, Schwartz's case would have been out of the Guidelines' "heartland" and therefore would have warranted an upward departure of several offense levels.[14] In our view, much of the old departure analysis folds rather well into the *Booker* methodology we have applied here, and so we will deny the Government's motion as moot.

*Conclusion*

As we hope is now apparent, Schwartz is far more odious and dangerous than Judge Easterbrook's "con man, fraud, phony, humbug and mountebank." All who deal with Schwartz should "be on the look-out" because there is not the slightest doubt that he has or will have "other marks in sight". Only time will tell who will next appear within Schwartz's crosshairs.

*ORDER*

AND NOW, this 26th day of July, 2005, upon consideration of the Government's motion for upward departure (docket no. 362), and the Court having taken into ac-

---

**13.** While we may hope that Schwartz's ardor for fraud and personal destruction will cool, we harbor no illusions and are rather put in mind of Alex in Anthony Burgess's novel and Stanley Kubrick's film *A Clockwork Orange,* when Alex says at the end, "I was cured, all

right." Stanley Kubrick, *A Clockwork Orange* (Warner Bros./Hawk Films 1971).

**14.** The Government recommended an eight-level upward departure, which would have resulted in a Guidelines range of 324–405 months' imprisonment.

count all of the aggravating factors the Government mentions in its motion, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the Government's motion is DENIED AS MOOT.